Maureen LITTLE, Plaintiff–Appellant,

v.

WINDERMERE RELOCATION, INC., a Washington corporation, Defendant–Appellee.

No. 99–35668.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted March 6, 2001.

Opinion Filed Sept. 12, 2001.

Amended Jan. 23, 2002.

Marilee Erickson, Danielle A. Hess and Jennifer L. Moore, Reed McClure, Seattle, WA, for the appellant.

Patrick N. Rothwell, Abbott, Davis, Rothwell, Mullin & Earle, P.C., Seattle, WA, for the appellee.

Before: PREGERSON, THOMAS and GOULD, Circuit Judges.

**ORDER**

The opinion filed on September 12, 2001, is hereby amended. With the amendments, the panel has voted to deny the petition for rehearing and to reject the suggestion for rehearing en banc.

The full court has been advised of the suggestion for rehearing en banc, and no judge of the court has requested a vote on the suggestion for rehearing en banc. Fed. R.App. P. 35(b).

The petition for rehearing is denied and the suggestion for rehearing en banc is rejected.

## OPINION

THOMAS, Circuit Judge.

Maureen Little ("Little") appeals from an order granting summary judgment on her claims of hostile work environment and retaliation in violation of Title VII, and wrongful discharge in violation of Washington state law. Because genuine issues of material fact exist on these claims, we reverse the judgment of the district court. We affirm the dismissal of her state law claim of negligent infliction of emotional distress.

### I

Taking the facts in the light most favorable to the plaintiff, as we must in evaluating the propriety of a grant of summary judgment, *see Ellison v. Brady,* 924 F.2d 872, 873 (9th Cir.1991), the events leading up to this lawsuit occurred as follows:

Little was employed by Windermere Relocation Services, Inc. ("Windermere") as a Corporate Services Manager, a position that required her "to develop an ongoing business relationship and relocation contacts with corporations in order to obtain corporate clients needing relocation services for their employees." Until she was terminated, she received only positive feedback from her supervisors. Windermere's records confirm that during the relevant period, Little had the best transaction closure record of all corporate managers by a large margin.

Unlike the other managers, Little's employment contract provided that Little would receive $2,000 monthly, plus a $1,000 monthly override and $250 per closed sale. The override was based on the assumption that Little would close four transactions per month, with a provision for rollover when she did not make target. According to Windermere President Gayle Glew, the other managers had not received the $1,000 override.

One of Windermere's clients was the Starbucks Corporation. Some time in 1997, Little performed some relocation services for Starbucks Human Resources Director, Dan Guerrero, on a contract basis, and she learned from him that Starbucks was dissatisfied with its primary relocation provider. Glew told Little that he would "do whatever it takes to get this account" and that Little should "do the best job she could." Thus, Little believed that, as part of her job, she was to build a business relationship with Guerrero to try to get the Starbucks account, and she had at least two business lunches with Guerrero toward this end.

On October 14, Little accepted Guerrero's invitation to discuss the account at a restaurant. After eating dinner with Guerrero and having a couple of drinks, Little suddenly became ill and passed out. She awoke to find herself being raped by Guerrero in his car. She fought him off and jumped out of the car, but again she became violently ill. Guerrero put her back in the car and took her to his apartment, where he raped her again. Little fell asleep, and when she awoke he was raping her again. Afterward, he showered and drove her to her car.

Little was reluctant to tell anyone at Windermere about the rape because, in her own words, "I knew how important the Starbucks account was to Mr. Glew. Mr. Glew would ask me on a consistent basis the status of the account and I was afraid that if I told him about the rape, he would see me as an impediment to obtaining the Starbucks account." This belief was reinforced when, a few days after the rape, Little reported the rape to Chris Delay, Director of Relocation Services (apparently not one of Little's supervisors), and Delay advised her not to tell anyone in management. Little believed that Delay

feared "what might happen to [Little] if [she] did tell."

On October 23, about nine days after the rape, Little reported it to Peggy Scott, the Vice President of Operations, who was designated in Windermere's Harassment Policy as a complaint-receiving manager. Little described Scott's response:

> She came out around the desk and I could tell she was upset and she just gave me a hug and said she wished there was something she could do. She didn't understand what I was going through. She asked me if I was in therapy. Then she proceeded to tell me she wouldn't say anything to [Glew] unless I proceeded to seek legal action [against Dan Guerrero].

Scott told Little that "[s]he thought it would be best that [Little] try to put it behind [her] and to keep working in therapy," and that she should discontinue working on the Starbucks account. She did not give Little any advice about going to the police, and she did not conduct an investigation of Little's complaint or any follow-up interview with Little. Scott testified in her deposition that, because the rape occurred outside the "working environment," she believed that it fell outside the scope of Windermere's Harassment Policy.

Despite Little's supposed removal from the Starbucks account, Glew continued to ask her about the status of the Starbucks account during the next six weeks. "[As of December 2,] Gayle was asking me questions about Starbucks ... a couple of times every month to see what the status was." Concerned by Glew's questions, Little told her immediate supervisor, Linda Bellisario, the Vice President of Sales and Marketing, on December 2, 1997, about the rape. Little had been reluctant to tell Bellisario because she "felt that [Bellisario] would immediately go to Gayle and Gayle would terminate my position.... I knew how much this account

meant to him. He said he would do whatever it took to get this account." Bellisario told Little to inform Glew of the incident.

When Little told Glew of the rape, which, according to Glew, was the first he had heard of it, Glew's "immediate response was that he did not want to hear anything about it." He told Little that she would have to respond to his attorneys. Glew then informed her that he was restructuring her salary from $3,000 monthly to $2,000 monthly plus $250 per closed transaction. The pay reduction was effective immediately and non-negotiable. Bellisario, who was present at that portion of the meeting, appeared "surprised and upset" to Little.

> She told me [later] that she had no idea Mr. Glew was going to cut my salary. It did not appear he had talked with her about my pay structure prior to his making his decision.... [She] was crying and she was upset, she said she had no idea that Gayle was going to talk about this at all. And she had no idea he was going to reduce my pay. And that she didn't want me to leave and she didn't know what to do. And she was pretty upset about the whole thing.

Little found the pay cut unacceptable, and Glew told her to go home for two days to think it over "because he did not want any 'clouds in the office.'" When Little still found the pay cut unacceptable two days later, Glew told her it would be best if she moved on and that she should clean out her desk.

Little brought suit against Windermere, alleging unlawful discrimination and retaliation in violation of Title VII, 42 U.S.C. § 2000e, and the Revised Code of Washington § 49.60; wrongful discharge in violation of public policy; and intentional, reckless, and/or negligent infliction of emotional distress. The district court granted

summary judgment in favor of Windermere on all four claims. We review the district court's grant of summary judgment *de novo. Ellison,* 924 F.2d at 873.

## II

Little alleges that Windermere's response to the rape created a hostile work environment in violation of Title VII and the Washington Law Against Discrimination, Rev. C. Wash. § 49.60.180(3). Because Washington sex discrimination law parallels that of Title VII, *see Payne v. Children's Home Society of Washington, Inc.,* 77 Wash.App. 507, 892 P.2d 1102, 1105 (1995), it is appropriate to consider Little's state and federal discrimination claims together.

Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.,* prohibits sex discrimination, including sexual harassment, in employment. 42 U.S.C. § 2000e–2(a)(1); *Meritor Savings Bank, FSB v. Vinson,* 477 U.S. 57, 65–66, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986).

 When evaluating a claim of sexual harassment based on a hostile work environment, we must determine two things: whether the plaintiff has established that she or he was subjected to a hostile work environment, and whether the employer is liable for the harassment that caused the environment. *See Faragher v. City of Boca Raton,* 524 U.S. 775, 787–89, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998); *Nichols v. Azteca Rest. Enters., Inc.,* 256 F.3d 864, 871–75 (9th Cir.2001). Both present mixed questions of law and fact that we review *de novo. See Id.* at 871, 875.

## A

 To establish that she was subjected to a hostile work environment, a plaintiff must prove that "1) she was subjected to verbal or physical conduct of a sexual nature, 2) this conduct was unwelcome, and 3) this conduct was sufficiently severe or

pervasive to alter the conditions of ... employment and create an abusive working environment." *Fuller v. City of Oakland,* 47 F.3d 1522, 1527 (9th Cir.1995) (internal quotations and citation omitted). There is no doubt that Little was subjected to unwelcome physical conduct of a sexual nature; the dispute here centers around the third element: whether the conduct was sufficiently severe or pervasive to create an abusive or hostile work environment. The district court did not make any findings on the severity or pervasiveness of the conduct, but rather found that liability could not be imputed to Windermere, and granted summary judgment on that basis. However, Little does not seek relief based on imputed liability for the rape. Rather, her claim is about whether Windermere's reaction to the rape created a hostile work environment.

 Under the third element, to determine whether an environment is sufficiently hostile or abusive to violate Title VII, we look "at all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Clark County Sch. Dist. v. Breeden,* 532 U.S. 268, 121 S.Ct. 1508, 1510, 149 L.Ed.2d 509 (2001) (internal quotation marks and citations omitted); *see Nichols,* 256 F.3d at 872. Moreover, "the work environment must both subjectively and objectively be perceived as abusive," *Fuller,* 47 F.3d at 1527 (citation omitted), and the objective portion of the claim is evaluated from the reasonable woman's perspective. *Ellison,* 924 F.2d at 879–80.

 Little has tendered sufficient evidence to preclude summary judgment on her hostile work environment claim. Guerrero's rape of Little was "severe."

Under the circumstances, it would have made a reasonable woman feel that her work environment had been altered: The nature of Little's employment extended the work environment beyond the physical confines of the corporate office. Having out-of-office meetings with potential clients was a required part of the job. The rape occurred at a business meeting with a business client. However, more significantly, Windermere's subsequent actions reinforced rather than remediated the harassment. Although she had no further contact with Guerrero, Little was not effectively removed from responsibility for the account. She was informed that reporting the rape would probably result in an adverse employment action, even to the point of jeopardizing her career. When she reported the rape to the President, he immediately decreased her compensation and referred her to corporate lawyers. Windermere disputes the significance of many of these events. However, viewing the facts in the light most favorable to Little, Windermere's failure to take immediate and effective corrective action allowed the effects of the rape to permeate Little's work environment and alter it irrevocably. Thus, genuine issues of material fact exist as to whether the "conduct was sufficiently severe or pervasive to alter the conditions of ... employment and create an abusive working environment" for Little. *Fuller*, 47 F.3d at 1527.

The tendered evidence stands in contrast to the circumstances of *Brooks v. City of San Mateo*, 229 F.3d 917, 924 (9th Cir.2000). In *Brooks*, we held that a "single incident" of harassment that was not "severe" and that was followed by immediate corrective action by the employer was not sufficiently "severe or pervasive" to create a hostile work environment. *Id.* at 925–26. Here, in contrast to the single instance of fondling in *Brooks*, Little was victimized by three violent rapes. In *Brooks*, the harassing employee was fired;

here, not only was there no remediation, the harassment was arguably reinforced by Little's employer.

■■■■ A single "incident" of harassment—and we assume *arguendo* that three rapes in the course of one evening constitutes a "single" incident—can support a claim of hostile work environment because the "frequency of the discriminatory conduct" is only one factor in the analysis. *See Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 23, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) (noting that "no single factor is required"). Conduct is actionable if it is either "sufficiently severe *or* pervasive." *Meritor*, 477 U.S. at 67 (emphasis added). Indeed, the Supreme Court recently noted that an isolated incident can amount to a "discriminatory change[ ] in the 'terms and conditions of employment' " when the incident is "extremely serious." *Breeden*, 532 U.S. 268, 121 S.Ct. at 1510, 149 L.Ed.2d 509 (citation omitted). Other circuits have come to a similar conclusion. *See, e.g., Tomka v. Seiler Corp.*, 66 F.3d 1295, 1305 (2d Cir.1995) (noting that "even a single incident of sexual assault sufficiently alters the conditions of the victim's employment and clearly creates an abusive work environment for purposes of Title VII liability"); *Guess v. Bethlehem Steel Corp.*, 913 F.2d 463, 464 (7th Cir.1990) (holding that a single incident where supervisor picked up plaintiff and forced her face against his crotch impliedly considered to create hostile environment); *cf. DiCenso v. Cisneros*, 96 F.3d 1004, 1009 (7th Cir.1996) ("[Although this single incident was insufficient, we do not] hold that a single incident of harassment never will support an actionable claim.").

■■■ Rape is unquestionably among the most severe forms of sexual harassment. Being raped by a business associate, while on the job, irrevocably alters the conditions of the victim's work environment. It

imports a profoundly serious level of abuse into a situation that, by law, must remain free of discrimination based on sex. Being raped is, at minimum, an act of discrimination based on sex. *See Brock v. United States,* 64 F.3d 1421, 1423 (9th Cir.1995) ("Just as every murder is also a battery, every rape committed in the employment setting is also discrimination based on the employee's sex."). Thus, the employer's reaction to a single serious episode may form the basis for a hostile work environment claim.

In sum, taking the facts in the light most favorable to Little, because her employer effectively condoned a rape by a business colleague and its effects, Little was subjected to an abusive work environment that "detract[ed] from [her] job performance, discourage[d] [her] from remaining on the job, [and kept her] from advancing in [her] career[ ]." *See Harris,* 510 U.S. at 22.

## B

Having determined that Little has presented a triable issue of whether she was subjected to a hostile work environment, we must decide whether Windermere can be liable for the harassment. *See Nichols,* 256 F.3d at 875; *see also Meritor,* 477 U.S. at 70–72 (noting that a Title VII plaintiff must also provide a basis for holding her employer liable for the harassment). "The relevant standards and burdens pertaining to employer liability vary with the circumstances." *Nichols,* 256 F.3d at 875.

In this circuit, employers are liable for harassing conduct by non-employees "where the employer either ratifies or acquiesces in the harassment by not taking immediate and/or corrective actions when it knew or should have known of the conduct." *Folkerson v. Circus Circus Enters., Inc.,* 107 F.3d 754, 756 (9th Cir.1997); *see also Lockard v. Pizza Hut, Inc.,* 162 F.3d 1062, 1073 (10th Cir.1998) (adopting *Folkerson* standard). The Equal Employment Opportunity Commission Guidelines endorse this approach: "An employer may also be responsible for the acts of non-employees, with respect to sexual harassment of employees *in the workplace,* where the employer (or its agents or supervisory employees) knows or should have known of the conduct and fails to take immediate and appropriate corrective action." 29 C.F.R. § 1604.11(e) (emphasis added). Thus, if Windermere ratified Guerrero's rape of Little by failing to take immediate and effective corrective action, it is liable for the harassment.

Windermere's precise remedial obligations are defined by *Ellison v. Brady:*

> [T]he reasonableness of an employer's remedy will depend on its ability to stop harassment by the person who engaged in harassment. In evaluating the adequacy of the remedy, the court may also take into account the remedy's ability to persuade potential harassers to refrain from unlawful conduct.

924 F.2d at 882 (footnote omitted). In addition, "[i]f 1) no remedy is undertaken, or 2) the remedy attempted is ineffectual, liability will attach." *Fuller,* 47 F.3d at 1528–29.

As discussed above, Windermere's response to the rape was equivocal at best. Construing the facts in the light most favorable to Little, she was informed that she should "do anything" to get the account; she was advised by a co-worker not to report the incident to top management because it would damage her career; when she reported the rape to her supervisor, she was not effectively removed from the account; and, when she finally reported the incident to the President, she was demoted and terminated. There is no evidence that Windermere took steps to pre-

vent contact between Little and Guerrero, such as effectively removing Little from the account or informing Starbucks that it must replace the contact it used with Windermere. Because of Windermere's failure to take appropriate remedial measures, Little has raised sufficient genuine issues of material fact as to whether Windermere ratified or acquiesced in the harassing conduct, and we reverse the district court's contrary conclusion.

## C

In sum, Little has raised genuine issues of material fact as to whether Windermere's actions (or inactions) subsequent to Guerrero's rape of Little subjected Little to a hostile work environment. Windermere will be liable for the hostile work environment created at Windermere after Guerrero's rape if a jury finds that it ratified or acquiesced in the rape by failing to take immediate corrective action once it knew or should have known of the rape. Therefore, the district court erred in granting summary judgment on this claim.

## III

Little also alleges that Glew reduced her pay and terminated her in retaliation for reporting the rape in violation of Title VII and the Revised Code of Washington § 49.60.210. Because Washington courts look to interpretations of federal law when analyzing retaliation claims, we again consider Little's state and federal claims together. *See Graves v. Dept. of Game,* 76 Wash.App. 705, 887 P.2d 424, 428 (1994). Genuine issues of material fact preclude summary judgment on this claim.

 To establish a *prima facie* retaliation claim under the opposition clause of 42 U.S.C. § 2000e–3(a), Title VII, Little must show 1) her involvement in a protected activity, 2) an adverse employment action taken against her, and 3) a causal link between the two. *See Brooks,* 229 F.3d at

928. Title VII provides, in relevant part, that "[i]t shall be an unlawful employment practice for an employer to discriminate against any of his employees … because he has opposed any practice made an unlawful employment practice by this subchapter." 42 U.S.C. § 2000e–3(a). It is unnecessary that the employment practice actually be unlawful; opposition thereto is protected when it is "based on a *'reasonable belief'* that the employer has engaged in an unlawful employment practice." *Moyo v. Gomez,* 40 F.3d 982, 984 (9th Cir.1994) (emphasis in original, citation omitted).

 A *prima facie* case may be based on direct or circumstantial evidence. *Id.* "Once a *prima facie* case has been made, the burden of production shifts to the defendant, who must offer evidence that the adverse action was taken for other than impermissibly discriminatory reasons." *Id.* The plaintiff can rebut this by producing "specific, substantial evidence of pretext." *Bradley v. Harcourt, Brace & Co.,* 104 F.3d 267, 270 (9th Cir.1996). Pretext, too, may be shown by circumstantial evidence, *see Wrighten v. Metropolitan Hospitals, Inc.,* 726 F.2d 1346, 1354 (9th Cir.1984), but it must consist of "more than a mere refutation of the employer's legitimate reason and [a mere assertion] that the discriminatory reason be the cause of the firing," *Wallis,* 26 F.3d at 890 (citation omitted).

 Little established a *prima facie* case. The district court correctly found that Little could have reasonably believed that, in reporting the rape to Scott, she was opposing an unlawful employment practice. *See Moyo,* 40 F.3d at 985. Given Little's belief that her relationship with Guerrero was strictly business, and that she met with him because it was part of her job as a Windermere employee, her belief that Windermere was required to

take action in response to his assault of her was eminently reasonable. *See, e.g., Fuller,* 47 F.3d at 1528–29 (holding that an employer must remedy situation of sexual harassment).

■■■■■ Second, Glew's reduction of her guaranteed monthly base salary from $3,000 (including the override) to $2,000 constituted an "adverse employment action." An "adverse employment action" is "any adverse treatment that is based on a retaliatory motive and is reasonably likely to deter the charging party or others from engaging in a protected activity." *Ray v. Henderson,* 217 F.3d 1234, 1244 (9th Cir. 2000) (citing EEOC Compliance Manual Section 8, "Retaliation," ¶ 8008 (1998)). This definition includes actions "materially affect[ing] compensation, terms, conditions, or privileges" of employment. 42 U.S.C. § 2000e–2(a)(1); *Kortan v. Cal. Youth Auth.,* 217 F.3d 1104, 1109 (9th Cir. 2000). A cut in base pay is clearly such an adverse action, despite, as the district court noted, Little's "hopes and expectations [of her sales and bonuses] for coming months or years." *See Ray,* 217 F.3d at 1241 (9th Cir.2000) (noting that "adverse employment action" is defined broadly); *see, e.g., Hashimoto,* 118 F.3d at 676 (holding that the dissemination of a negative job reference constitutes an "adverse employment action"). And, of course, termination of employment is an adverse employment action; Little has presented triable issues of fact that she was, indeed, fired.

■■■■ Third, Little has presented evidence that the adverse employment action occurred within minutes of her reporting the rape to Glew. This close timing provides circumstantial evidence of retaliation that is sufficient to create a *prima facie* case of retaliation. *See Passantino v. Johnson & Johnson Consumer Prods., Inc.,* 212 F.3d 493, 507 (9th Cir.2000) (noting that causation can be inferred from timing alone); *see, e.g., Miller v. Fairchild*

*Indus.,* 885 F.2d 498, 505 (9th Cir.1989) (stating that a *prima facie* case of causation was established when discharges occurred forty-two and fifty-nine days after EEOC hearings); *Yartzoff v. Thomas,* 809 F.2d 1371, 1376 (9th Cir.1987) (stating that sufficient evidence existed where adverse actions occurred less than three months after complaint filed, two weeks after charge first investigated, and less than two months after investigation ended).

■■■■ As required in a retaliation case, Windermere has properly rebutted Little's *prima facie* case with evidence of a legitimate, non-discriminatory motive for altering Little's pay structure. Glew testified and declared that he had grown increasingly dissatisfied with and concerned by Little's failure to make four closings per month, as contemplated in her employment agreement. Scott and Glew both testified that they met in November to discuss Little's lower-than-expected performance. Glew declared that, after considering the options, he decided to restructure Little's compensation to conform to the base that had been previously given. His decision to terminate her was consistent with his decision to restructure her pay. This evidence establishes a legitimate, non-discriminatory reason for the pay cut.

■■■■■ However, Little has tendered sufficient evidence, in addition to the proximity of events, to rebut this alleged reason. Little testified that, until the pay cut and termination, she had received only positive feedback, and that she never knew of the four-deal-per-month requirement; although her employment contract states so explicitly, she may have received verbal assurances that she believed were superceding. Little averred that it took time to establish business relationships, making it difficult to close four deals per month in her first year as a Corporate Services

Manager, and that her supervisors knew that. Further, the data showing Little's superior performance, in addition to Little's belief that her work was more than satisfactory, cast doubt on Glew's decision to cut the pay of the most successful corporate caller Windermere apparently had yet employed, and particularly to make the cut non-negotiable. Little's description of Bellisario's surprise and concern at the pay cut supports this interpretation—as Little's direct supervisor, Little believed that Bellisario would have been involved in that decision. These facts, together with the proximity in timing, suffice to create a question of fact regarding Windermere's motive in cutting Little's pay and ultimately terminating her employment. "[A] *prima facie* case is insufficient to preclude summary judgment, a plaintiff need produce 'very little evidence of discriminatory motive to raise a genuine issue of fact' as to pretext." *Strother v. Southern California Permanente Medical Group,* 79 F.3d 859, 870 (9th Cir.1996) (citations omitted). Thus, summary judgment was inappropriate on this claim.

## IV

 In addition to her federal discrimination claims, Little has alleged that Windermere wrongfully discharged her in violation of Washington law. Under this Washington tort claim, Little must establish four elements: 1) the existence of a clear public policy (the *clarity* element); 2)"that discouraging the conduct in which [she] engaged would jeopardize the public policy (the *jeopardy* element)"; 3) "that her public-policy-linked conduct was a substantial factor in (i.e. the cause of) Windermere's decision tó discharge her (the *causation* element)"; and 4) that employers generally do not have an "overriding justification" for wanting to use the activity as a factor affecting the decision to discharge (the *absence of justification* element). *Ellis v. City of Seattle,* 142

Wash.2d 450, 13 P.3d 1065, 1070 (2000) (en banc) (quoting *Gardner v. Loomis Armored Inc.,* 128 Wash.2d 931, 913 P.2d 377 (1996) (en banc)); *see also Lins v. Children's Discovery Centers of America, Inc.,* 95 Wash.App. 486, 976 P.2d 168, 172 (1999). Genuine issues of material fact preclude summary judgment on the elements of the claim, as well as whether Little resigned or was discharged.

 First, Little has established the clarity element required by Washington Law Against Discrimination, Revised Code of Washington § 49.60. In analyzing this element, "courts should inquire whether the employer's conduct contravenes the letter or purpose of a constitutional, statutory, or regulatory provision or scheme." *Thompson v. St. Regis Paper Co.,* 102 Wash.2d 219, 685 P.2d 1081, 1089 (1984).

> In general, it can be said that public policy concerns what is right and just and what affects the citizens of the State collectively.... Although there is no precise line of demarcation dividing matters that are the subject of public policies from matters purely personal, a survey of cases in other States involving retaliatory discharges shows that a matter must strike at the heart of a citizen's social rights, duties, and responsibilities before the tort will be allowed.

*Dicomes v. State,* 113 Wash.2d 612, 782 P.2d 1002, 1006 (1989) (en banc) (citation omitted). Little argued that Windermere discharged her because she made a complaint about sexual harassment. The Washington Supreme Court held recently that Revised Code of Washington sections 49.12.200 and 49.60.010 embody a clearly articulated public policy condemning sex discrimination in employment. *See Roberts v. Dudley,* 140 Wash.2d 58, 69, 993 P.2d 901, 907 (2000) (en banc) (holding that discharging an employee because she was on maternity leave would violate that poli-

cy). Relatedly, discharging an employee because of his opposition to a practice in violation of a public policy forms a cause of action for wrongful discharge. *See Ellis*, 13 P.3d at 1070. Thus, Little has articulated a clear public policy—against sex discrimination in employment—that Windermere's action may have contravened.

■ Little tendered sufficient evidence concerning the second element, namely, that she was "engaged in particular conduct" that *"directly relate[d]* to the public policy, or [that] was *necessary* for the effective enforcement of the public policy." *Gardner*, 913 P.2d at 377 (emphasis in original). In *Ellis*, after noting that a retaliation claim exists under § 49.60.210, the court found that "the jeopardy prong ... may be established if an employee has an objectively reasonable belief the law may be violated in the absence of his or her action." 13 P.3d at 1071. As discussed previously, Little has established a reasonable belief that Guerrero had sexually harassed her and that her reporting to Windermere could prevent further harassment. She has therefore established the jeopardy prong of *Gardner*. *Accord Ellis*, 13 P.3d at 1071 (firing fireman "for raising questions about the legality of what he was told to do jeopardizes the public policy of following the fire code").

■ Little has raised a genuine issue of fact as to the third element, namely, whether Windermere's termination of her employment was in retaliation for her report of the rape—that is, whether her report was a "substantial factor" in Windermere's decision to terminate her.

■ Finally, Windermere has not offered—and cannot offer—any general overriding justification for using an employee's report of sexual harassment as a reason to discharge that employee. *Cf. Lins*, 976 P.2d at 173 (stating that employers have no "overriding justification" for wanting to consider employee's refusal to

perform an unlawful order). In fact, Windermere's sexual harassment policy encourages employees to report such behavior and provides a mechanism by which Windermere can correct such behavior.

In sum, Little has established the first two elements of her wrongful discharge claim, and she has raised questions of fact regarding the second two elements. Thus, summary judgment was not appropriate on this claim.

## V

■ The district court correctly entered summary judgment against Little on her claim for negligent infliction of emotional distress in violation of Washington state tort law. To establish this cause of action, Little "must show (1) that her employer's negligent acts injured her, (2) the acts were not a workplace dispute or employee discipline, (3) the injury is not covered by the Industrial Insurance Act, and (4) the dominant feature of the negligence claim was the emotional injury." *Snyder v. Med. Serv. Corp. of Eastern Wash.*, 98 Wash.App. 315, 988 P.2d 1023, 1028 (1999). Like all negligence claims, a negligent infliction of emotional distress claim requires duty, breach, proximate cause, and injury. *Hunsley v. Giard*, 87 Wash.2d 424, 553 P.2d 1096, 1102 (1976). Little also must show objective symptoms of emotional distress. *See Corrigal v. Ball & Dodd Funeral Home, Inc.*, 89 Wash.2d 959, 577 P.2d 580, 582 (1978) (citing *Hunsley*, 553 P.2d at 1103).

■ However, Washington courts "[do] not recognize a claim against an employer for negligent·infliction of emotional distress ... 'when the only factual basis for emotional distress [is] the discrimination claim.'" *Robel v. Roundup Corp.*, 103 Wash.App. 75, 10 P.3d 1104, 1113 (2000) (quoting *Chea v. Men's Wearhouse, Inc.*, 85 Wash.App. 405, 932 P.2d 1261 (1997)).

Here, Little's only factual basis is that "Windermere failed to investigate Ms. Little's complaint, then cut her pay and terminated her employment." This argument formed an integral part of her discrimination claim and the emotional injury she alleges is compensable in her discrimination action. This cause of action is therefore not cognizable under Washington law and the entry of summary judgment was appropriate.

## VI

In sum, we reverse the grant of summary judgment and remand for trial Little's claims of hostile work environment and retaliation in violation of Title VII and Washington's Law Against Discrimination and her claim for wrongful discharge in violation of public policy. We affirm the dismissal of her claim for negligent infliction of emotional distress in violation of Washington state tort law.

**AFFIRMED in part, REVERSED in part, and REMANDED for further proceedings consistent with this opinion. The parties shall bear their own costs.**