**EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Plaintiff,**

**v.**

**LOVE'S TRAVEL STOPS & COUNTRY STORES, INC., Defendant.**

No. CV–07–1843–PHX–ROS.

United States District Court, D. Arizona.

Dec. 30, 2009.

Sally Clifford Shanley, Diana Crespo Weaver, Mary Joleen O'Neill, Equal Employment Opportunity Commission, Phoenix, AZ, for Plaintiff.

Nathan Lee Whatley, McAfee & Taft APC, Oklahoma City, OK, John Greg Coulter, Littler Mendelson PC, Phoenix, AZ, for Defendant.

## ORDER

ROSLYN O. SILVER, District Judge.

Before the Court is Defendant's Motion for Summary Judgment (Doc. 70). For the reasons discussed below, the Motion will be denied.

## BACKGROUND

On September 26, 2007, Plaintiff Equal Employment Opportunity Commission ("EEOC") filed a complaint under Title VII of the Civil Rights Act of 1964 and Title I of the Civil Rights Act of 1991, alleging Defendant Love's Travel Stops & Country Stores, Inc. ("Love's") subjected its female employees to a hostile work environment by failing to take corrective action after being put on notice that the employees were frequently being sexually harassed by customers. (Doc. 1).

The EEOC filed the complaint on behalf of two individuals, Sarah Gregoire and Monica Day, who worked as cashiers at Love's Buckeye, Arizona store. (Docs. 70 at 2; 72 at 1). Ms. Day worked at the store from December, 2004 to July, 2005 (Docs. 70 at 2; 73 at ¶¶ 24, 25), and Ms. Gregoire worked there from approximately June, 2005 to September, 2005. (Docs. 70 at 2; 73 at ¶¶ 1, 40). The EEOC alleges Ms. Day was sexually harassed by customers on several occasions during her employment, including having one customer frequently make references to having sexual intercourse with her, another telling her that due to her short height she could perform oral sex on him without getting on her knees, one trying to touch her hand and telling her he would wait until she got off work so he could "get inside [her]," and one customer giving her a sexually suggestive Valentine's Day card. (Doc. 73 at ¶¶ 27–32). The EEOC alleges Ms. Day complained to management about these incidents, but was either laughed at, told it was "to be expected," or to "deal with it." (Doc. 73 at ¶¶ 29, 33, 35). The EEOC alleges Ms. Gregoire experienced similar forms of harassment, including having one customer grab her shoulders from behind and later poke her in the neck with a pen, having one tell her that he wanted to "squeeze her nipples," having another make references to "chewing on [her] nipple" or "spreading [her] thighs," and having customers frequently follow her into the shower area. (Doc. 73 at ¶¶ 5, 7, 8, 19). The EEOC alleges Ms. Gregoire complained to management about these incidents, and she was ignored or told, "This is a truck stop. Get used to it. Deal with it." (Doc. 73 at ¶¶ 6–9).

## DISCUSSION

### I. STANDARD

Summary judgment is appropriate where "there is no genuine issue as to any material fact" and "the movant is entitled to judgment as a matter of law." Fed R. Civ. P. 56(c). To enter summary judgment, the Court must examine all evidence and find no dispute concerning genuine issues of material fact. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255–256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The evidence of the non-moving party is to be believed, and all reasonable inferences drawn in its favor. *See id.* "[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (internal citations omitted). However, if the nonmoving party bears the burden of proof at trial, the moving party's summary judgment motion need only highlight the absence of evidence supporting the non-moving party's claims. *See Devereaux v. Abbey,* 263 F.3d 1070, 1076 (9th Cir.2001) (citing *Celotex Corp.,* 477 U.S. at 323–25, 106 S.Ct. 2548). The burden then shifts to the non-moving party who must produce evidence sustaining a genuine issue of disputed material fact. *See id.* An issue is "genuine" only if there is sufficient evidence for a reasonable fact finder to find for the non-moving party. *Far Out Prods., Inc. v. Oskar,* 247 F.3d 986, 992 (9th Cir.2001) (citing *Anderson,* 477 U.S. at 248–49, 106 S.Ct. 2505). Accordingly, a "court need not draw *all* possible inferences in [the non-movant's] favor, but only all *reasonable* ones." *Villiarimo v. Aloha Island Air, Inc.,* 281 F.3d 1054, 1065 n. 10 (9th Cir. 2002). A fact is "material" if it may affect the outcome of the case. *Far Out Prods.,*

*Inc.,* 247 F.3d at 992. Evidence produced to support motions for summary judgment must be admissible and otherwise adhere to the Federal Rules of Evidence. *See* Fed.R.Civ.P. 56(e)(1).

## II. MOTION FOR SUMMARY JUDGMENT

### A. Elements of a Sexual Harassment–Hostile Work Environment Claim

■ Section 703 of Title VII prohibits sexual harassment in employment, including conduct that "has the effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment." 29 C.F.R. § 1604.11(a); *Little v. Windermere Relocation, Inc.,* 301 F.3d 958, 966 (9th Cir.2002). To evaluate a claim of a hostile work environment caused by sexual harassment, a court must make two basic determinations: first, whether the plaintiff was subjected to a hostile work environment caused by sexual harassment, and second, whether the employer is liable for the harassment that caused that environment. *Little,* 301 F.3d at 966.

■ To establish that a Plaintiff was subjected to a hostile work environment caused by sexual harassment, a Plaintiff must show: "1) she was subjected to verbal or physical conduct of a sexual nature, 2) this conduct was unwelcome, and 3) this conduct was sufficiently severe or pervasive to alter the conditions of . . .

employment and create an abusive working environment." *Id.* (internal quotations and citations omitted). The applicable standard for the second element, whether the employer can be held liable for the harassment that caused the hostile environment, varies depending on the circumstances. *Id.* at 968. In the Ninth Circuit, employers are liable for harassment caused by non-employees "where the employer either ratifies or acquiesces in the harassment by not taking immediate and/or corrective actions when it knew or should have known of the conduct." *Id.* (internal quotations and citations omitted).

### B. Arguments

■ Defendant does not argue it is entitled to summary judgment because Plaintiff has insufficient evidence that Ms. Day and Ms. Gregoire were sexually harassed by customers. Nor does Defendant argue Plaintiff has insufficient evidence that Ms. Day and Ms. Gregoire notified management of the alleged harassment or sought management's assistance. Instead, Defendant argues it is entitled to summary judgment because: (1) an undisputed fact proves Defendant took sufficient remedial action to address the harassment, and (2), even if all the alleged incidents of sexual harassment occurred, they are insufficiently severe and pervasive to sustain a hostile work environment claim as a matter of law.[1] (Doc. 70 at 2). These arguments will be considered in succession.

---

1. In its Reply in support of its motion for summary judgment, Defendant misstates the standard for summary judgment, and implies that Plaintiff bears the burden of showing there are genuine issues of material fact on all material issues, whether or not Defendant challenged the Plaintiff on those issues in its motion for summary judgment. Defendant claims that to avoid summary judgment, "Plaintiff must produce 'evidentiary materials' to 'designate facts showing that there is a genuine issue for trial.' " (Doc. 75 at 1, quoting *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548). This description of the burden placed on Plaintiff to overcome a motion for summary judgment is partially correct, but it is incomplete. Plaintiff need not prove there is a genuine issue of material fact on *all* material issues—Plaintiff need only show there is a genuine issue of material fact on the issues that Defendant raises in its motion for summary judgment. Where the non-moving party

### 1. Defendant's First Argument: An Undisputed Fact Proves Defendant Took Sufficient Remedial Action

■ Defendant argues when its female employees complained to management "about various 'problems with customers,'" it "responded expeditiously and adequately." (Doc. 70 at 5). Specifically, Defendant states Love's management removed shower cleaning duties from its female employees' job detail. (Doc. 70 at 5). Defendant cites "Undisputed Fact No. 1," which quotes portions of Ms. Gregoire's deposition in which she states she complained to a manager after a team meeting that she was being followed into the showers and offered money for sex, and the manager responded, "well, that's why we're going to have maintenance taking care of the showers. You don't have to go back there anymore. He said, if you have any more problems, let me know." (Docs. 70 at 5; 69 at ¶ 1). Defendant does not cite any other evidence in support of its position that it took sufficient remedial action. Plaintiff responds with several arguments.

Plaintiff argues, first, that the removal of the cashiers' shower duties was not an attempt by Defendant to address its employees' sexual harassment complaints, but a change in policy intended to keep them near the registers to reduce theft. Plaintiff cites the following testimony of Ms. Gregoire:

Q. What was the purpose of changing the duties, that some of which you were doing to being maintenance's responsibility from that point forward?

. . .

The Witness: I believe that he didn't want us leaving the diesel station, because there would be loose money clipped onto the shelf for people that would pay in advance. . . . So I believe it was precaution for the—for the money that was coming in through the Trendar or through the diesel.

(Doc. 73, Ex B at 31–32). In reply, Defendant argues Mr. Coomes, a manager, "clearly stated, according to Gregoire, 'that's why we're going to have maintenance taking care of the showers'" in response to Ms. Gregoire's complaint that she had been followed into the showers and solicited for sex. (Doc. 75 at 3). Mr. Coomes and Ms. Gregoire's explanations of the reason the shower cleaning duties were removed are not necessarily inconsistent; it is possible Love's management removed the shower cleaning duties for multiple reasons. Viewed in the light most favorable to the nonmoving party, however, Ms. Gregoire's testimony provides some evidence that Defendant's removal of shower cleaning duties was intended to safeguard the cash registers and was not a genuine attempt to address the sexual harassment.

Plaintiff also argues the removal of shower duties could not have been a genuine attempt to address the employees' sexual harassment complaints (or an effective attempt) because it did not come in a timely manner. Plaintiff argues by the time the shower duties were removed the harassment had already been ongoing for

---

bears the burden of proof at trial (as here), it is true that the moving party need not produce evidence of an absence of a genuine issue of material fact on that issue. *See Celotex,* 477 U.S. at 325, 106 S.Ct. 2548. But the moving party nevertheless still bears an initial burden of highlighting to the court that there is an absence of evidence to support the non-

moving party's position on that issue. *See Devereaux,* 263 F.3d at 1076. As the Supreme Court put it in *Celotex,* the moving party has a burden of " 'showing'—that is, pointing out to the district court-that there is an absence of evidence to support the nonmoving party's case." 477 U.S. at 325, 106 S.Ct. 2548.

several months, and one of the affected employees had already been terminated. Plaintiff claims when Ms. Gregoire initially complained to managers that she was being followed into the showers, "no action was taken to address or investigate her complaint." (Doc. 73 at ¶ 7). Plaintiff cites the following testimony of Ms. Gregoire as evidence:

A. I had a guy follow me in the shower to the back. I believe I was getting a towel or something. I wasn't going all the way back there, but I had a guy follow me. And I pretty much had enough of it. And I believe I told Pat or one of the other managers. I believe it was Pat, about it. About him following me back there.

Q. And then what happened after that?

A. Nothing.

(Doc. 73, Ex B at 58–59). Plaintiff does not allege the date this conversation took place, or state the amount of time that later elapsed before Defendant removed the shower cleaning duties. Defendant, on the other hand, does not directly respond to this evidence, does not claim this conversation never took place, and does not affirmatively claim to have removed the shower duties in a timely manner in response. Instead, Defendant responds to this testimony by generally arguing that paragraphs 3 through 9 of Plaintiff's statement of facts mischaracterize testimony. Defendant argues even if the incidents described in paragraphs 3 through 9 occurred, Ms. Gregoire "clearly testified that there was **never** a time in which she sought managerial assistance with a customer issue and management declined to assist her." (Doc. 75 at 2). But it is not clear that Ms. Gregoire's testimony is that she was "never" declined assistance. It is inconsistent with much of her testimony, including the portion quoted above, in which she states she notified a manager

that she was followed into the showers and "nothing" happened afterward. Also, by the time the shower cleaning duties were reassigned, Ms. Day was no longer an employee at Love's, which Defendant concedes. (Doc. 75 at 2).

Ms. Gregoire's testimony that the removal of shower cleaning duties was intended to prevent theft, her testimony that when she first complained about being followed into the showers "nothing" happened, and the undisputed fact that Ms. Day had already been terminated by the time shower duties were reassigned, taken together and viewed in the light most favorable to Plaintiff, establish a genuine issue of material fact regarding whether the removal of shower duties was a timely and genuine remedial response to the complaints of harassment alleged by Ms. Gregoire and Ms. Day.

Plaintiff also argues, even if the removal of shower cleaning duties was a genuine attempt by Defendant to address the sexual harassment experienced by Ms. Gregoire and Ms. Day, it was not a sufficient remedial response because the cashiers were still required to go to the shower area to retrieve supplies and the harassment in the shower area continued. (Doc. 72 at 3; 73 at ¶ 14). In support, Plaintiff cites the following testimony of Ms. Gregoire:

Q. It didn't happen after Pat came though because you weren't going back to the showers anymore; right?

A. No, but I would still need to grab things from a cart. It was like a cart. It would have towels. I had to stock it. It had towels and soap and other things. I believe I went back there to grab a towel or something of that nature. I went back there because I had to.

(Doc. 73, Ex B at 60). Defendant replies that Ms. Gregoire never stated the harassment continued, and in fact, she testified

"entirely to the contrary." (Doc. 75 at 3). Ms. Gregoire's testimony is ambiguous. But taking all reasonable inferences in favor of Plaintiff, the above testimony can be interpreted to mean she was still *required* to go to the shower area, and that the harassment there continued.

Finally, Plaintiff argues Defendant's removal of shower duties from its female cashiers' job detail was not an effective or sufficient remedial response because it only addressed one of many forms of sexual harassment experienced by Defendant's employees. According to Plaintiff, Ms. Gregoire "not only complained many times of inappropriate comments and touching when she was required to clean the showers, but also complained many times about harassment that occurred during her normal duties at the cash register." (Doc. 72 at 8). Plaintiff claims Ms. Gregoire complained to managers Marguerite Welty, Tammie Tokeshi, Felicia Allen, and T.J. Gimble that a customer told her he wanted to " 'squeeze her nipples,' " and no action was taken (Doc. 72 at 8–9; Doc 73 at ¶ 8). According to Plaintiff, management responded by telling Ms. Gregoire to "get used to it." (Doc. 73 at ¶ 9). Plaintiff cites the following testimony of Ms. Gregoire:

Q. [D]id you ever at a time later after an incident had happened, complain to a manager about somebody saying, you know, 'I want to squeeze your nipples' or something like that?

A. Yes.

Q. Okay. Do you have any specific recollection today of who you complained to?

A. Marguerite, Tammy. I usually worked with Marguerite.

Q. Okay.

A. Felicia and TJ.

Q. Okay. And I believe your testimony was that their response was in general, sort of get used to it; is that correct?

A. Yes it was.

(Doc. 73, Ex B at 83–84). Plaintiff claims Ms. Gregoire received this "get used to it" response from the managers on multiple occasions, citing the following testimony of Ms. Gregoire:

A. Usually we're to fend for yourselves when it comes to customers.

Q. Who told you that?

A. Tammy, Felicia, TJ. They all told me more than once, this is a truck stop. Get used to it. Deal with it.

(Doc. 73, Ex B at 57). Plaintiff also presents testimony from Ms. Gregoire that managers Tammie Tokeshi and Paul LNU stood by and watched while Ms. Gregoire was being harassed by a customer, and failed to take any action:

[W]hen Tammy and the other floater manager, I think it was Paul I think his name was, or Philip, we were all behind the counter. No, on the other side, you know, where the customers are . . . . And I was discussing something with Tammy and him, and I had my back towards the showers. And a guy approached me and he put his hands on my shoulders and, like, dug his hands into my shoulder. And I pushed him back and I told him, I said, don't touch me. And then he came back with a pen, and he poked me in the back of my neck with a pen, so much that it left a piece—it left ink on my neck. And they saw that. So did the cameras, because of where we were standing. And nothing was said to him, and he was a regular . . . . So they were—it wasn't something that they were oblivious to and that I needed to speak out so they would—it was something that was ongoing and probably still is. It's an issue there. It's not being taken care of.

(Doc. 73, Ex B at 55–56). In its reply, Defendant argues paragraphs 5, 8, and 9 of Plaintiff's statement of facts, which describe these incidents, are "rife with mischaracterizations and liberal samplings of 'favorable' testimony.'" (Doc. 75 at 2). But Defendant does not state how Plaintiff mischaracterized the cited portions of testimony, does not offer any evidence that controverts it, or even deny that the incidents described by Ms. Gregoire occurred. Instead, Defendant argues even if "these incidents actually occurred, Gregoire clearly testified that there was **never** a time in which she sought managerial assistance with a customer issue and management declined to assist her." (Doc. 75 at 2). Defendant cites the following testimony of Ms. Gregoire:

> Q: Okay. But my question is, was there ever a time when you asked a manager for help with a customer issue, and they told you they wouldn't help you?
>
> A. No, because it didn't really—like it—it didn't happened just like—like—well, I have a problem. Let me go tell my manager. The customer is already gone. So you can't really—you're kind of tied to your area. Unless you have a manager with you, they don't know about it until after the fact.
>
> * * * *
>
> Q. This [letter] doesn't talk about a single instance, does it, where you asked for help from Pat to deal with a customer and he said no?
>
> A. I never said that he did anything like that.

(Doc. 69 at 2–3). It is contradictory for Defendant to claim that the testimony cited by Plaintiff could be true but that Ms. Gregoire was never declined managerial assistance for an incident of sexual harassment. In the testimony cited by Plaintiff, Ms. Gregoire alleges she complained to four different managers after customers made sexual comments to her and was told to get used to it. She also testified that three of the managers, Tammy, Felicia, and TJ, all told her "more than once" that she was working at a truck stop and should get used to the harassment. If true, it cannot be that Ms. Gregoire "clearly testified there was never a time in which she sought managerial assistance with a customer issue and management declined to assist her." At best, the testimony of Ms. Gregoire cited by Defendant in support of that contention is ambiguous. It can be inferred that Ms. Gregoire stated there was never a time when she requested assistance from a manager while the customer was still present, or immediately after the harassment occurred, because it would have been impractical to do so given that she was tied to the cash register area. Her response also might be interpreted to mean there was never a time when a manager literally told her, "I will not help you." Ms. Gregoire's testimony, viewed in the light most favorable to Plaintiff, establishes an issue of material fact regarding whether or not she complained to several managers on multiple occasions that she was experiencing sexual harassment from customers and no remedial action from Defendant was forthcoming.

Defendant makes the additional argument that Ms. Gregoire's testimony reveals that Love's management could not have known about the harassment until after it occurred, and thus Defendant cannot be liable. Defendant does not explain why this would relieve it of liability, and appears to imply that Ms. Gregoire should have predicted the times she was going to be sexually harassed in order to give Love's management advance warning. Defendant's liability does not turn on whether it knew of the harassment before or after it occurred, but on whether it took adequate remedial action once it was given notice that its female cashiers were being regularly sexually harassed by customers.

Plaintiff also presents evidence that Ms. Day made similar complaints to management that she was regularly experiencing sexual harassment from customers, and no remedial action was taken by Defendant. Plaintiff cites the following testimony of Ms. Day:

Q. What did [the guy that always came in and bothered you] say to you that you were bothered by?

A. Well, he had always talked about sexual intercourse. Talking about, I'd like to take you home. Why don't you come outside. Or, let me wait for you, or—in some incidents he would have beer, and he would say, why don't you come have a drink and, you know.

Q. What would you say in response to that?

A. I would repeat my age first off, 'cause he was older. And then I would say, that's inappropriate. I would ask him to leave, 'cause after a while, the managers weren't doing anything, so I just tried to take it upon myself to ask him to leave. And I would ask him repeatedly to leave me alone.

Q. And what would he say in response to that?

A. Hey, baby, I can rock your world or something ignorant like that.

Q. Would he then leave the store?

A. No. Most time he would hang around. I would just again repeat, I'm not interested.

Q. And you spoke to Felicia about that?

A. Yes.

Q. What was her response?

A. She laughed.

(Doc. 73, Ex F at 32–33). Plaintiff offers evidence that this was not an isolated incident. Plaintiff cites testimony of Ms. Day that she repeatedly complained to managers about various forms of sexual harassment, including having one customer tell her that because of her height she could perform oral sex on him without getting on her knees, another customer try to touch her hand and then tell her he would wait for her to get off work so he could "get inside her," and another giving her a sexually suggestive Valentine's Day card (Doc. 73 at ¶ 30, 31, 32). According to Plaintiff, on the various occasions when Ms. Day complained about these incidents to managers, she was told "that's to be expected," was ignored, or was told to "deal with it." (Doc. 73 at ¶ 33, 34, 35). Plaintiff cites various portions of Ms. Day's testimony in support of these claims, including the following:

A. When I would try to talk to [manager Felicia] and approach her about the sexual harassment situation, I got blown off.

Q. What would you say to her?

A. Many different things. There were lots of incidents, but I remember going to her about a customer, and telling her how much of a pig, in other words, that he was being. And how inappropriate. And she said, oh, that's to be expected.

* * * *

Q. Any other times besides those three that you stopped and went and talked to a manager while the customer was actually in the store?

A. There was tons of times that, like I said, I went and talked to a manager and the customer was still in the store, but I don't recall every single incident.

Q. What would happen in those situations? You would go and talk to the manager?

A. They would tell me to brush it off or it's not important or just it's to be expected. You know, the same things. Basically—I mean, not the exact words, but basically deal with it and get back to work.

(Doc 73, Ex F at 30, 60–61). Defendant does not offer any evidence to controvert

this testimony. Instead, Defendant argues it is not liable for failing to respond to Ms. Day's complaints because "Love's management could not have possibly been aware [of the incidents of harassment] until 'after the fact.' Management is not required to be a roving enforcement officer." (Doc. 75 at 6). This argument, however, is without explanation or legal support.

Defendant misunderstands the standard for determining employer liability for sexual harassment by non-employees. In the Ninth Circuit, employers are liable for harassment caused by non-employees "where the employer either ratifies or acquiesces in the harassment by not taking immediate and/or corrective actions when it knew *or should have known of the conduct.*" *Little v. Windermere Relocation, Inc.,* 301 F.3d 958, 968 (9th Cir.2002) (emphasis added). Under this standard, employers are required to take "corrective action" when they have knowledge that harassment has occurred or have reason to know will occur. The standard is not that employers are only required to take corrective action only when they become aware of the harassment before it occurs. Although there may be situations in which an employer will be given advance warning that an employee will be sexually harassed by a non-employee, and which would re-quire the employer to take preventative action, it is more likely that the employer will not become aware of the harassment until after it has occurred and can then ensure it is not repeated. The rule requiring immediate or corrective action does not require an employer to become a "roving enforcement officer," but merely requires some form of action be taken to address the sexual harassment and prevent it from being repeated. There are various forms of corrective action that might be taken by an employer to relieve it of liability. Here, however, Plaintiff alleges Defendant took *no* action to address its employees' repeated complaints of sexual harassment, and instead simply ignored the complaints or told the employees to get used to it. Defendant presents no evidence to controvert this testimony. The evidence creates a genuine issue of material fact regarding whether Defendant failed to take any corrective action when its female employees complained to management about ongoing sexual harassment from customers.[2]

2. **Defendant's Second Argument: The Alleged Incidents of Sexual Harassment Are Insufficient to Sustain a Hostile Work Environment Claim as a Matter of Law**

■ Defendant argues it is entitled to summary judgment because the alleged

---

2. Defendant bases its claim that it took sufficient remedial action entirely on a passage of Ms. Gregoire's testimony relating to one conversation between Ms. Gregoire and a manager and involving one purported response to one incident of alleged harassment. But Defendant ignores the portions of Ms. Gregoire's testimony in which she alleges she experienced other forms of harassment, complained to management about it, and management failed to respond. Defendant does not, for example, present evidence to refute Ms. Gregoire's testimony that she repeatedly complained to management about sexually offensive comments from customers and was told "this is a truck stop. Get used to it. Deal with it." (Doc. 73–2, Ex B at 57, 83). Defen-

dant does not refute Ms. Gregoire's testimony that she "made numerous complaints" about a regular customer who would use words like "pussy" and "nipple," and suggest that she spread her thighs or that he chew on her nipple, and that management "did nothing." (Doc. 73–2, Ex B at 61–62). Defendant does not offer evidence to controvert any of the incidents of harassment allegedly experienced by Ms. Day. For example, Ms. Day's testimony that she complained to Manager Felicia Allen about being sexually harassed and Ms. Allen only laughed, (Doc. 73–2, Ex F at 33), or Ms. Day's testimony that she made repeated attempts to report sexual harassment, but was told "that's to be expected" or "deal with it." (Doc. 73–2, Ex F at 30, 37–29, 60–61).

incidents of harassment by Love's customers "cannot be objectively or subjectively perceived as so 'highly questionable, pervasive, or severe'" as to significantly alter the terms and conditions of Ms. Gregoire or Ms. Day's employment. (Doc. 70 at 7–8). In support, Defendant states both Ms. Gregoire and Ms. Day testified they were able to perform their job. (Doc. 70 at 8). This fact, even if true, has little relevancy. A plaintiff alleging a hostile work environment need not claim the environment was so severe it was impossible to work at all. *See Little*, 301 F.3d at 966. A hostile work environment need not force an employee to quit in order to give rise to an actionable claim.[3]

Defendant also supports its claim that the alleged harassment was insufficiently severe or pervasive by pointing to a letter Ms. Gregoire sent to corporate headquarters in which she stated she "loved" her job. (Doc. 70 at 8). In relying on this statement, Defendant implies it is impossible to both love one's job for some reasons and to hate if for others, such as sexual harassment. This is *not* impossible, as the context in which Ms. Gregoire stated she loved her job makes quite clear. Ms. Gregoire stated she loved her job as a cashier in the context of a lengthy letter to corporate headquarters in which she complains about that very job, in part because of sexual harassment. (Doc. 73–1, Ex G).

Plaintiff offers sufficient evidence to sustain a genuine issue of material fact regarding whether the harassment experienced by Ms. Gregoire and Ms. Day was severe and pervasive enough to give rise to an actionable hostile work environment claim. First, Plaintiff presents evidence that the alleged harassment was subjectively perceived as severe. Plaintiff cites Ms. Gregoire's testimony that the harassment would make her cry. (Doc. 73 at ¶ 17). Defendant does not deny the harassment would make Ms. Gregoire cry, or offer evidence to controvert Ms. Gregoire's testimony. Instead, Defendant simply repeats the unpersuasive refrain that Plaintiff mischaracterizes the testimony, because Ms. Gregoire testified there was **"never** an occasion on which she sought managerial assistance with a customer issue and management declined to assist her." (Doc. 75 at 4).

Plaintiff offers similar sufficient testimony from Ms. Day in which she states the harassment was at times so severe she would cry, but she could not quit because she needed the work. (Doc. 73 at ¶ 37). Defendant admits Ms. Day offered this testimony, but argues she also "clearly stated that she was able to continue to 'do her job' the whole time that she was employed by Love's." (Doc. 75 at 7). Merely because it was not impossible for Ms. Day to continue to work as a cashier does not discredit her testimony that the harassment was harsh enough that she would cry.[4] Again, an employee is not required to quit her job in order to preserve an actionable hostile work environment claim.

Second, Plaintiff presents evidence that the harassment experienced by Ms. Gregoire and Ms. Day was frequent, ongoing,

---

3. Defendant actually acknowledges this, stating, "Questions as to whether Day did nor did not consider leaving her job are largely irrelevant to the material aspects of an actionable third party harassment claim." (Doc. 75 at 7).

4. Plaintiff also cites a portion of the letter sent by Ms. Gregoire to Love's corporate headquarters, in which she describes incidents of sexual harassment from customers, and states, "This behavior makes me feel uncomfortable, distracts me from my work, and I wanted some direction as to how to handle this type of harassment." (Doc. 72 at 10). Defendant does respond to or attempt to controvert this testimony.

and severe, and not simply an "isolated incident" as Defendant contends. (Doc. 75 at 6). The evidence is that on different occasions Ms. Gregoire was grabbed by the shoulders and poked in the neck with a pen, was followed into the shower areas where she was offered money for sex, had a regular customer who would frequently make vulgar references to "chewing her nipple," "spreading her thighs," and similar remarks, and had another customer tell her he wanted to "squeeze her nipples." (Doc. 72 at 3–4). Regarding Ms. Day, the evidence shows that a customer frequently made reference to having sexual intercourse with her; another customer told her that because of her height she could perform oral sex on him without getting on her knees; another tried to stroke her hand and then told her he would wait until she got off work so he could "get inside [her];" and another gave her a sexually suggestive Valentine's Day card. (Doc. 72 at 4). Defendant offers no evidence to controvert Ms. Gregoire's and Ms. Day's testimony regarding these incidents.

As Plaintiff correctly alleges, "These women are not required to recall every specific time or exactly what was said." (Doc. 72 at 9). Plaintiff has established that these incidents are only a sampling of the sexual harassment experienced by Ms. Gregoire and Ms. Day. A reasonable juror could infer from the evidence that Ms. Gregoire and Ms. Day were sexually harassed by customers on a regular, ongoing basis.[5]

Viewed in the light most favorable to Plaintiff, the Court finds that a reasonable

jury could find the numerous incidents of customer sexual harassment alleged by Ms. Gregoire and Ms. Day to be sufficiently severe or pervasive to alter the conditions of their employment and to give rise an actionable hostile work environment claim. Plaintiff has also presented sufficient evidence upon which a reasonable jury could find that Defendant is liable for the alleged hostile work environment caused by its customers because it failed to take sufficient (or any) corrective action to address it.

Accordingly,

**IT IS ORDERED** Defendant's Motion for Summary Judgment (Doc. 70) **IS DE-NIED.**

**FURTHER ORDERED** the parties shall file the pretrial documents referenced in the Rule 16 Scheduling Order within 30 days of this Order.

---

**5.** Ms. Gregoire, for example, testified, "[The harassment] wasn't something that [the managers] were oblivious to and that I needed to speak out so they would—it was something that was ongoing and probably still is. It's an issue there. It's not being taken care of." (Doc. 73–2, Ex B at 56). Regarding being followed into the showers, Ms. Gregoire testified, "[T]his was something that was reoccurring; that happened a lot." (Doc. 73–2, Ex B at 60). Ms. Day, similarly, testified, "There was tons of times that, like I said, I went and talked to a manager [about harassment] and the customer was still in the store, but I don't recall every single incident." (Doc. 73–2, Ex F at 60).