# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

MARIANO ROMULO,

        Appellant,

        v.

SEATTLE PUBLIC UTILITIES, a
department of the CITY OF SEATTLE,
a municipality,

        Respondent.

No. 82790-1-I

DIVISION ONE

UNPUBLISHED OPINION

BIRK, J. — Mariano Romulo sued the City of Seattle (City) after he was terminated from his employment at Seattle Public Utilities (SPU). The trial court dismissed some claims and a jury returned a verdict for the City on Romulo's remaining claims. On appeal, Romulo argues the trial court erred by dismissing his hostile work environment claim and his claim for whistleblower retaliation in violation of the Seattle Municipal Code (SMC). Romulo also argues the trial court erred in instructing the jury on his claims for wrongful discharge in violation of public policy and retaliation in violation of the Washington Law Against Discrimination (WLAD), chapter 49.60 RCW.

We hold that the trial court's jury instructions contained a clear misstatement of the law in that they precluded Romulo from arguing that actions short of termination were adverse employment actions for purposes of his WLAD retaliation claim. We also hold that the City fails to overcome the presumption that this

instructional error was prejudicial. Therefore, we remand to the trial court for further proceedings on Romulo's WLAD retaliation claim solely to the extent it is based on alleged adverse employment actions short of termination. We affirm in all other respects.

I

We are reviewing principally whether the jury instructions allowed Romulo to argue his theory of the case and whether the trial court properly granted summary judgment on certain other claims. Therefore, we present the facts in the light most favorable to Romulo. See Young v. Key Pharms, Inc., 112 Wn.2d 216, 226, 770 P.2d 182 (1989) (in reviewing a summary judgment decision, we consider the facts in the light most favorable to the nonmoving party).

Romulo was born in the Philippines and is ethnically Filipino. English is Romulo's second language, and he speaks it with an accent.

Romulo began working for the City in 1993. He joined the SPU's water department in 1995, eventually working his way up to journeyman pipefitter.

In 2007, Romulo filed a lawsuit (2007 Lawsuit) against the City alleging violations of the WLAD. Romulo's 2007 Lawsuit brought to light that Muriel Fair, a senior inspector in the SPU's Utility Service Inspections (USI) group who reported up to Vic Roberson, a division director, did not have a certification required of senior inspectors. Fair later testified that this led to her attending a meeting with Roberson and a woman—Fair did not know who she was—where the woman "was very adamant that [Fair] was not to have this job," and Fair was informed she could

be terminated if she did not obtain the certification. Fair also testified that "[w]hoever was at that meeting" talked to her about Romulo's complaint.

In February 2009, Romulo and the City settled the 2007 Lawsuit. As part of the settlement, the City transferred Romulo to the position of senior inspector in the USI group in March 2009, joining Fair and another senior inspector, Bob Eastwood. Romulo was the only Filipino American in the USI group, and the only member of the group who spoke English with an accent.

Senior inspectors are responsible for the SPU's "cross-connection control program," a program required by the Washington State Department of Health (DOH). WAC 246-290-490(3)(a). A "cross-connection" is "any actual or potential physical connection between a public water system or the consumer's water system and any source of nonpotable liquid, solid, or gas" that could contaminate the potable water supply by "backflow." WAC 246-290-010(58). "Backflow" refers to "the undesirable reversal of flow of water or other substances through a cross-connection into the public water system or consumer's potable water system." WAC 246-290-010(17). The DOH requires water purveyors, such as the SPU, to implement cross-connection control programs that, among other things, ensure that cross-connections are controlled by backflow preventers. WAC 246-290-490(2)(a), (f), (3)(a). The SPU has approximately 13,000 customer facilities with cross-connections. The SPU requires these facilities to, as mandated by the DOH regulations, have their backflow prevention assemblies tested annually. WAC 246-290-490(7)(b)(ii). Customers submit test reports to the SPU, which enters the

3

reports into "XC2," the database the SPU uses to record information about its customer facilities.

The DOH deems certain cross-connections "high health hazard" cross-connections because they pose a potential public health hazard should backflow occur.  See WAC 246-290-010(122).  High health hazard (HHH) facilities include car washes, hospitals, mortuaries, petroleum processing plants, and wastewater treatment plants.  WAC 246-290-490(4)(b)(iv) tbl. 13.  The SPU has approximately 800 HHH customer facilities.  Senior inspectors are responsible for ensuring the HHH facilities have achieved "premises isolation" by installing an approved backflow preventer at an appropriate location.

On a yearly basis, the SPU compiles data from XC2 and submits an "Annual Summary Report" to the DOH.  The report specifies how many of the HHH facilities are being served by the SPU and how many have premises isolation.  It also specifies the number of backflow prevention assemblies that were tested in the previous calendar year.

When Romulo joined the USI group in 2009, his direct supervisor was Ward Pavel, the USI manager, who reported to Roberson.  Under Pavel, the senior inspectors' priority was ensuring that facilities complied with the annual backflow prevention assembly testing requirement.  The SPU used a sequence of escalating form letters to enforce the requirement.  The purpose of these letters was to urge facilities to maintain up-to-date testing compliance.  The first three letters were generated administratively and warned of future consequences should a test not be submitted.

"Letter 4" was a 30 day water shutoff notice that would trigger involvement by a senior inspector such as Romulo, who would physically deliver it to the customer "to make sure that they're aware that they're not in compliance." Romulo testified Letter 4 "worked very well" as an enforcement mechanism. In 2014, of the 62 Letter 4s that were sent, only one customer was sent a "Letter 5," which was a 48 hour shutoff notice. "Letter 6" was a postshutoff notice advising the customer that, to restore water service, the customer had to submit all test reports to the SPU.

In his performance review for 2013, Romulo was commended for "play[ing] a key role in the development and success of the backflow assembly testing program th[at] year, and reaching our highest percentage of compliance ever." He was also commended for doing "a great job completing the [Annual Summary Report] for [the] DOH this year" and for providing "excellent customer service to internal and external customers." Pavel rated Romulo a "4" (on a scale of "1" through "5") on all but one metric, for which he rated Romulo a "3." Pavel had given Romulo similarly high marks in his past reviews.

In fall 2014, Pavel retired. With the USI manager position vacant, there was a period when Roberson wore "two hats," and the USI group reported to him. Romulo testified he approached Roberson after Pavel's retirement about getting started on the 2014 Annual Summary Report, but Roberson "kept ignoring" Romulo. Romulo testified he later obtained authorization from another manager to start work on the report.

5

In March 2015, the DOH sent the SPU a letter regarding the SPU's 2014 Annual Summary Report, and it addressed the letter to Romulo. The letter was also sent to Roberson via e-mail. Roberson forwarded the letter to Fair and Eastwood, but not Romulo, with the message, "Fyi—I got this today." Romulo testified that after this letter "popped up," he "no longer had access to [the DOH]," and Roberson would have had the authority to terminate Romulo's access. Romulo testified that he also got removed from working on the Annual Summary Report even though, under Pavel, he and the other senior inspectors had worked on it together. He testified that although he offered to support Eastwood and Fair with regard to the report, nobody sought his help.

Meanwhile, Roberson selected Fair to work "out of class"[1] for 90 days in the USI manager role, which she did until December 2014. Romulo and Eastwood both applied to succeed Fair as out of class manager, and Eastwood was selected "based on a review of [Roberson] and committee." Romulo did not ever work as out of class manager, but he was one of multiple candidates selected for a first round interview for the permanent USI manager position. Romulo testified he heard nothing about the second interview, and then was told by Roberson he did not get the job because he did not have out of class manager experience. Romulo filed a formal grievance regarding this decision with the SPU human resources (HR), indicating in his cover letter that he "now [found his] job meaningless, a death to [his] dignity, self worth, family, [and] general welfare."

---

[1] An out of class assignment is a temporary assignment "to perform the normal ongoing duties and responsibilities associated with a higher-paying title."

6

In May 2015, Bob Hubbert became the new USI manager, Romulo's immediate supervisor, and Roberson's direct report. Roberson had recommended Hubbert for the position.

Romulo later testified that at some point in 2015, he noticed a change in the number of Letter 4s being generated, and he wondered why. Hubbert testified he "paused" sending the escalating testing letters. Although Hubbert testified he "would have told" his staff the letters were no longer going out, he could not point to any documentation of his decision to stop sending the letters. Although he agreed that the decision was "a big deal," he could not recall "who [he] told specifically."

On August 21, 2015, Hubbert e-mailed Roberson about a call he received from the DOH raising concerns that some of the SPU's HHH customer facilities were not adequately protected based on the SPU's past few Annual Summary Reports. In his e-mail, on which he copied the senior inspectors, Hubbert described the importance of backflow assembles at the HHH facilities in terms that, when viewed in the light most favorable to Romulo, implied that Hubbert had not learned of their importance until the DOH call. He wrote that likely "[n]ext [s]teps" for the USI group would include confirming if the information reported was accurate, and that "[s]enior [i]nspectors will need to perform site inspections at all premises where there may be a concern." (Boldface omitted.) A few days later, Hubbert e-mailed the senior inspectors again and expressed concern they were spending too much time on "secondary-role efforts," including "calls and emails about cross connections that are already protected" and "[t]rying to achieve higher

7

backflow testing compliance." In Hubbert's view, the team was spending "too little time on [its] primary role," which Hubbert described as "[t]he protection of public health and drinking water quality from both unknown, and more importantly, known but unprotected [HHH] cross connections" and "[e]nsuring our database . . . is being used consistently, effectively, and efficiently." Romulo testified he did not agree with Hubbert's assessment, and felt Hubbert "wanted to give [Romulo's] Washington State Department of Health job duties to admins."

On October 29, 2015, the DOH provided formal notice to the SPU that its "water system doesn't comply with the premises isolation requirements in WAC 246-290-490." According to the DOH's notification letter, the SPU's 2014 Annual Summary Report showed that it was serving multiple HHH facilities with unprotected cross-connections.

At some point, a performance review was prepared for Romulo covering May 2015 through December 2015. Whereas Pavel had rated Romulo a "4," or "above standard," on almost all metrics a year and a half earlier, this review rated Romulo a "2," or "below standard," on the same metrics. The "Supervisor Rater Comments" section of the review states,

> Issues primarily related to attendance, focus, attitude, communication skills, and teamwork have impacted [Romulo]'s ability to complete his work in a manner that meets expectations. The results have been issues with productivity and reliability, as well as with customer service. [Romulo] has ignored repeated direction to stay focused on primary work tasks and has not taken advantage of the support offered to him. His actions have created an uncomfortable environment in the workplace for many and have hindered SPU's ability to protect public health and drinking water quality. My continued expectation is that [Romulo] will take immediate steps to perform at a higher level and to help the Utility

8

Inspection Services team with managing and improving the Cross Connection Control program.

The review was not signed, and the record does not reflect whether it was delivered to Romulo.

Romulo testified that meanwhile, Hubbert "never trusted [Romulo's] work." Romulo also testified that from 2015 onward, his access to XC2 was restricted to "view only," and even though Hubbert later directed him to "creat[e] new accounts in XC2 by using the discussed and trained process," Romulo could not add data to XC2 because of his view-only access, and he never received the training Hubbert was referring to. Romulo testified that Hubbert would cut him off during meetings and whenever they had a conversation, and he did not feel "safe" in one-on-one meetings with Hubbert—to the point where Romulo expressed that he needed a union shop steward at meetings with Hubbert "so someone can hear or at least be a mediator or somehow create an environment where we can have a mutual . . . understanding because it wasn't happening."

In February 2016, Hubbert e-mailed the USI group outlining expectations with regard to late arrivals. Hubbert told the team that if they started their day at an offsite facility, "then it is expected that you will be in your vehicle and ready to travel at your start time and that you will be at the Central Building [in downtown Seattle] within 30 minutes of your start time." Hubbert instructed the team that if they were going to arrive late, then they would need to provide as much advance notice as possible. Romulo started his day at the SPU's north end facility on 135th Street, and he testified he had a longer commute than most of his colleagues. Romulo testified there were times he could not get downtown, find parking, and

9

make it into the Central Building by 7:30 due to traffic. He also testified that under Pavel, he would sometimes address field issues before going into the office, and no one would complain or criticize him if he arrived after 7:30. Romulo testified that Hubbert, in contrast, monitored the time at which Romulo swiped his badge to enter the office and complained about Romulo being late.

In March 2016, Romulo e-mailed Hubbert in follow-up to a meeting and wrote, "When I ask a question and no one understand[s] my question, I am not ok to be disregarded because others do not understand what I said and then move on [with] the meeting. . . . I will not be pushed . . . around to shut up and not speak." About a month later, Romulo e-mailed Hubbert to express that he felt "shut down" when Hubbert ignored a question that Romulo had asked but answered everyone else's questions.

In August 2016, after a USI monthly team meeting Hubbert was unable to attend, Romulo circulated what he described as "draft comments" to the meeting attendees and Hubbert, characterizing them as his "attempt to document meeting minutes for . . . Hubbert's review to keep him included." Hubbert responded and wrote, "This email is inappropriate and is a violation of the expectations I have communicated to you. . . . Please be reminded that my expectation of you, which has been communicated clearly and often, is that you stay focused on your primary Senior work duties."

In October 2016, Hubbert approved Romulo to use two hours of paid time to attend the annual conference of the Filipino American Civic Employees of Seattle (FACES), of which Romulo was the president. However, Hubbert denied

Romulo's request to participate for the full day. Romulo asked Roberson if he could use a day of vacation to attend, and according to Romulo, Roberson did not respond until the day before the event to tell him that he was not allowed to go. Romulo did not attend.

On October 31, 2016, Roberson sent Romulo a memo confirming a verbal warning about inappropriate and unprofessional language Romulo had used in e-mails to other SPU employees. Roberson had advised Romulo that an August 25 e-mail he sent was inappropriate, and after that advisement, Romulo "wrote 4 emails, in a 6 hour period, demanding an explanation, each time adding in more personnel," demanding responses and including the statements, " 'Do not ignore me!!!' " and " 'Damn it!!!' "

On November 8, 2016, Hubbert approved Romulo's request to take a vacation day on November 21, 2016. Romulo testified that when he got to work on November 22, Hubbert set up a meeting with Roberson to discuss Romulo's absence on the 21st, and indicated that it could lead to disciplinary action. Romulo testified that at the meeting, "Hubbert . . . expressed how bad of an employee [Romulo] was in front of . . . Roberson." When Hubbert finished, Romulo produced a copy of Hubbert's vacation approval, and according to Romulo, Roberson and Hubbert both "had a change of look in [their] face[s]" and dropped the matter. Romulo testified he felt targeted and wondered why Hubbert "didn't just ask [him] if it was approved."

In February 2017, Romulo e-mailed Hubbert to ask whether he could use a personal holiday due to icy road conditions. Hubbert responded, "Time loss

11

incurred by an employee due to inclement weather may be charged against vacation, compensatory time, personal holidays, other appropriate leave balances, or time off without pay." Romulo wrote back, "Your email says, 'maybe.['] So, I ask again for confirmation of approval . . . . Again, ok to allow me to use personal holiday for the last two days, that is yesterday and today and NOT use vacation, compensatory time and / or time off without pay?? I prefer using my personal holidays." Hubbert responded, "I apologize if me quoting the personnel rule, which includes the words '*may be*', created confusion. . . . In this form, the words '*may be*' are used to express permission, as opposed to the word '*maybe*' that you replied with which implies uncertainty."

In March 2017, Hubbert gave Romulo a written reprimand for unprofessional and inappropriate behavior. According to the reprimand, an e-mail Romulo sent on March 3, 2017 was "disrespectful to someone who—[he] believed—did not respond to [him] quickly enough."

On April 7, 2017, Hubbert e-mailed Romulo and the other senior inspectors asking them to "be prepared to submit your [HHH] inspection progress _weekly_ starting next week." (Boldface omitted.) This is the earliest written reference in the record to Hubbert's re-tasking senior inspectors to emphasize field inspection of HHH facilities rather than testing compliance. Hubbert directed the senior inspectors to "[d]ocument the details surrounding Premises Isolation very clearly" and assigned each inspector certain categories of HHH facilities, with Romulo responsible for piers and docks, laboratories, car washes, "[d]edicated fire protection systems with chemical addition," and "[v]eterinary." (Boldface omitted.)

A week later, Hubbert e-mailed the senior inspectors again and directed them to, among other things, confirm that the HHH facilities had "<u>obvious</u> Premises Isolation adjacent to the meter, somewhere between the meter and the first penetration into the building, or at the first penetration into the building, and no connection in between." He also directed the senior inspectors to "[c]learly, thoroughly, and consistently document your findings in XC2."

Romulo testified that although he understood Hubbert wanted him "to go out in the field," he could determine whether a facility had premises isolation by looking at backflow test reports in XC2. Romulo testified that in May 2017, he prepared a table of car washes, using red font to identify the ones that he had determined did not have premises isolation. He testified that he attempted during a May 22, 2017 meeting to give Hubbert an update using that report, but according to an e-mail Romulo wrote after the meeting, he "was not able to finish reporting since . . . Hubbert kept interrupting [him]."

On May 11, 2017, Hubbert gave Romulo his annual performance review for calendar year 2016. Hubbert rated Romulo "1" (unacceptable) or "2" (below standard) on all metrics except safety, for which he gave Romulo a "3" (meets standard). The review included the following comments, which Hubbert later recalled were authored by Roberson:

> Romulo has consistently displayed the inability to stay on task and contribute to the team in which he is a member. [Romulo] appears to be often distracted and disengaged from his work. At times [Romulo] seems to not understand his job duties or is inca[pa]ble of carrying them out. He will ask for direction on routine issues for which a senior utility inspector should be [able] to resolve. [Romulo] must make a concerted effort to improve attendance, perform his

13

duties satisfactor[il]y and contribute to his team so that he can meet basic employee expectations in the coming year.

Romulo e-mailed Hubbert, Roberson, and Susan Sanchez, Roberson's supervisor, in response to the review, and he raised the issue of testing compliance letters no longer being sent:

> This 2016 performance review has unacceptable and below standard performance when I have had regularly above average performance result. Bob Hubbert and Vic Roberson [are] having a hard time managing CCC Program. *We currently do not have an admin to send letter notices and I do not have a way to enforce water quality standards and enforcement towards compliance without knowing who is not following WSDOH requirements that makes it impossible to enforce.* I am not able to provide enforcement when customers are not informed regarding WSDOH requirements to test the backflows resulting in WSDOH violations in 2014 and 2015.

(Emphasis added.)

Hubbert testified the other senior inspectors gave him frequent updates about their HHH inspections, but Romulo did not. On June 1, 2017, Hubbert sent an e-mail to the SPU upper management reporting that the senior inspectors besides Romulo had completed 50 out of 79 and 68 out of 128 inspections respectively, but Romulo "ha[d] not provided/submitted any updates."

On June 9, 2017, Hubbert e-mailed Romulo and asked him to "provide a thorough report of all your completed . . . inspections and the relevant findings as related to all of the [HHH] facilities that were assigned to you in April." About a week later, Hubbert e-mailed Romulo again, indicating that he had not yet received the requested report and "directing [Romulo] again to provide a thorough report of all [his] completed . . . inspections and the relevant findings as related to the [HHH] facilities that were assigned to you in April."

On June 16, 2017, Romulo sent Hubbert a spreadsheet described as "the rest of [the] car wash report." Hubbert testified the attachment "seemed to be a continuation of the same thing [Romulo] had submitted before and wasn't a thorough report or it didn't provide any of his findings" and "[t]here was no information other than the font changes." Hubbert directed Romulo to provide him with "supporting findings and/or details for the carwash facility inspections [Romulo] completed" as well as a "thorough report of [Romulo's] completed . . . inspections and the relevant findings" related to the other four categories of HHH facilities that had been assigned to him. (Boldface omitted.) Romulo delivered to Hubbert a set of printed spreadsheets that, according to Hubbert, did not provide any additional detail and indicated that nearly all of the HHH facilities Romulo had inspected did not have premises isolation. Hubbert e-mailed Romulo that he "need[ed] more information from [Romulo] than a database list with red or green font changes." Hubbert observed that the number of premises isolation deficiencies Romulo was reporting was "a significant change from historical protection compliance reporting," and "to ensure an appropriate response to [Romulo's] reported findings, [Hubbert would] need to clearly understand what information [Romulo] collected at each of the[] sites to make [his determinations]."

On July 6, 2017, Hubbert scheduled a fact-finding meeting to address Romulo's "failure to provide a thorough inspections report for all [HHH] facilities assigned to [him]."

On July 7, 2017, Hubbert recommended to Mami Hara, the SPU's general manager, that Romulo be suspended for three days without pay "due to his

15

continued pattern of late arrivals to work." According to Hubbert's memorandum to Hara, "in the first quarter of 2017, out of the 34 days Mr. Romulo reported to work, he was late 21 times, for a total of 323 minutes." Hubbert's memo included a list of Romulo's late arrivals for January through March 2017, based on his badge swipe time. The latest arrival on the list was at 8:07 a.m., and 9 of the 21 of documented arrivals were between 7:30 and 7:40 a.m.

A fact-finding meeting took place on July 25, 2017, and was attended by Hubbert, Romulo, a representative from HR, and Romulo's union shop steward. Hubbert testified that he learned through the fact-finding that "Romulo had been performing his inspections from his desk and hadn't been going out into the field." Hubbert testified that at the meeting, he "clarified again that the expectation was that the assignment be completed by performing field inspections, providing thorough notes and findings." Hubbert testified that, as summer 2017 progressed, he did not recall receiving any updates from Romulo.

In late August 2017, Hubbert became aware of two cases of Legionnaires' disease at the University of Washington Medical Center (UWMC). On August 25, 2017, Hubbert notified the group of the cases via e-mail to "giv[e] them a general kind of heads-up" because customers might call to ask about it. Three days later, Romulo sent an e-mail to the SPU upper management forwarding Hubbert's e-mail and urgently asserting that the UWMC was not in compliance with its backflow assembly testing requirements.[2]

---

[2] There is no evidence that actual backflow occurred.

On September 8, 2017, Romulo e-mailed Wylie Harper, the SPU's Director of Drinking Water Quality, expressing among other things that Romulo felt the SPU's cross-connection program "ha[d] been abandoned and neglected." Romulo again referred to the backflow assembly testing compliance letters in his e-mail, describing the pause in sending letters as "safety issues" and "unsafe practices."

On September 11, 2017, Hara accepted Hubbert's recommendation to suspend Romulo for three days. Hara did not rely solely on Romulo's late arrivals but also on Hubbert's and Roberson's earlier reprimands and Romulo's failure to attend a scheduled fact-finding meeting.

On September 29, 2017, Hubbert scheduled another fact-finding meeting to address Romulo's "specific efforts towards completing the [HHH] inspections assignment." The meeting took place on October 6, 2017, and was attended by Hubbert, Romulo, Romulo's union shop steward, and Dale Hitsman, a representative from HR. Hitsman later recalled that during the meeting, Hubbert asked Romulo how many HHH inspections he had completed, and Romulo at first responded zero, and then said "like about 5 or so."

After the October 6, 2017 fact-finding, Romulo was placed on paid administrative leave pending Hitsman's investigation into "whether or not [Romulo] had completed any of the [HHH] assignments and, if he had not, then was there other work that he was doing during that time that would have precluded him from completing that assignment."

On May 7, 2018, Romulo, who remained on paid administrative leave, initiated this lawsuit against the City.

17

On January 7, 2019, Hitsman completed his investigation and issued a report. During his investigation, Hitsman had contacted Romulo and asked him if he could quantify his inspections, and according to Hitsman, Romulo identified three inspections he believed he had completed: (1) a well, (2) an Audi dealership, and (3) a pier and dock account. Hitsman testified he learned during his investigation that wells were not one of the HHH facility types assigned to Romulo. And, according to Hitsman, Romulo claimed that Hubbert told him piers and docks were not part of his job assignment—a claim Hubbert denied. Hitsman thus concluded that Romulo had completed only one out of approximately 222 inspections assigned to him.

Hitsman also found the other senior inspectors had each completed around 200 inspections within about two or three months. Hitsman found no indication that something else was preventing Romulo from completing the assigned inspections.

On February 27, 2019, Romulo submitted a complaint to the Seattle Ethics and Elections Commission (SEEC) alleging that his being on paid administrative leave since October 6, 2017 and drawing a full salary and benefits constituted "a gross waste of public funds."

In April 2019, Harper recommended to Hara that Romulo be discharged based on his failure to perform assigned duties. On May 17, 2019, after a

Loudermill[3] hearing, Hara notified Romulo of his termination effective May 23, 2019.

On November 5, 2019, Romulo filed his third amended, operative complaint herein. Romulo alleged the following causes of action against the City: (1) hostile work environment in violation of the WLAD, owing to race and/or national origin; (2) retaliation in violation of the WLAD; (3) "harassment . . . in retaliation for complaining about discrimination and retaliation, and for filing a whistleblower complaint"; (4) hostile work environment for disclosing improper government action, in violation of the SMC; and (5) wrongful discharge in violation of public policy.

In May 2020, the trial court denied Romulo's motion for partial summary judgment dismissal of the City's failure-to-state-a-claim defense as it related to Romulo's SMC-based claim.

In February 2021, the trial court granted the City summary judgment with regard to Romulo's harassment and hostile work environment claims, as well as his SMC-based claim. It denied the motion as to Romulo's claims for (1) retaliation in violation of the WLAD and (2) wrongful discharge in violation of public policy, and those claims proceeded to a jury trial in March 2021. The jury found that Romulo failed to prove either claim. The trial court entered judgment in the City's favor.

---

[3] Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 545-46, 105 S. Ct. 1487, 84 L. Ed. 2d 494 (1985) (holding that a public employee threatened with termination is entitled to a pretermination hearing as "an initial check against mistaken decisions").

Romulo appeals.[4]

II

Romulo asserts that he presented evidence of a number of possible adverse employment actions, short of termination, that would have supported his WLAD retaliation claim, including: (1) his negative evaluations, (2) Hubbert's treatment of him in meetings, (3) the August 2016 e-mail in which Hubbert described Romulo's "draft comments" circulated following a meeting as "inappropriate," (4) Hubbert's denial of Romulo's request to attend the full FACES conference, (5) Hubbert's accusing Romulo of an unexcused absence that Hubbert had actually approved, (6) Hubbert's limiting Romulo's access to XC2 and not giving him XC2 training, (7) the February 2017 e-mail in which Hubbert distinguished "may be" from "maybe," (8) the March 2017 written reprimand for unprofessional and inappropriate behavior, and (9) Hubbert's recommending Romulo be suspended for his late arrivals. Romulo contends the trial court erred by giving instructions that prevented him from arguing that actions short of termination could be considered as potential adverse employment actions in connection with his WLAD retaliation claim. We agree.

---

[4] Romulo assigns error to the trial court's summary judgment rulings and its judgment in favor of the City, and to the trial court's decisions (1) denying reconsideration of its denial of Romulo's motion for partial summary judgment and (2) denying Romulo's motion for a new trial. Romulo does not allege any legal error in the denial of these latter two motions separate from his challenges to the merits of the underlying rulings. Accordingly, we do not separately address these denials. RAP 10.3(a)(4), (6).

A

"Jury instructions are sufficient when they allow counsel to argue their theory of the case, are not misleading, and when read as a whole properly inform the trier of fact of the applicable law." Bodin v. City of Stanwood, 130 Wn.2d 726, 732, 927 P.2d 240 (1996). "Where substantial evidence supports a party's theory of the case, trial courts are required to instruct the jury on the theory." Taylor v. Intuitive Surgical, Inc., 187 Wn.2d 743, 767, 389 P.3d 517 (2017).

We review a trial court's decision whether to give a jury instruction " 'de novo if based upon a matter of law, or for abuse of discretion if based upon a matter of fact.' " Id. (quoting Kappelman v. Lutz, 167 Wn.2d 1, 6, 217 P.3d 286 (2009)).

B

Before trial, Romulo proposed an instruction that to prevail on his WLAD retaliation claim, Romulo had to prove both that (1) he participated in a proceeding to determine whether discrimination or retaliation had occurred and (2) his participation was "a substantial factor in *any adverse action*" taken against him. (Emphasis added.) The instruction was paired with an instruction based on a pattern instruction and defining "adverse employment action" as follows: "An employment action is adverse if it is harmful to the point that it would dissuade a reasonable employee from making a complaint of discrimination, harassment or retaliation." See 6A WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CIVIL 330.06, at 343 (7th ed Supp. 2022) (WPI).

21

The City proposed instructions requiring that Romulo prove retaliation was a substantial factor in Romulo's termination, without allowing the possibility of the jury finding retaliatory "adverse actions" short of termination. The City asserted that "[r]ather than referring ambiguously to the phrase 'any adverse action,' the jury should be instructed as to the specific alleged adverse action at issue if something other than and/or in addition to termination." The City "presume[d] this [would] be a matter for the parties to address, and the judge to resolve, after plaintiff's case-in-chief and/or after the close of the evidence."

After the City rested, Romulo proposed an amended instruction that provided, in relevant part,

> To establish a claim of unlawful retaliation by the City of Seattle, Mariano Romulo has the burden of proving both of the following propositions:
> (1) That Mariano Romulo had participated in a proceeding to determine whether discrimination or retaliation had occurred; and
> (2) That this was a substantial factor in an adverse action, *including but not limited to the failure to hire Mr. Romulo into the position formerly held by Ward Pavel, negative performance evaluations, discipline such as oral and written warnings, written reprimand, suspension, placement on paid administrative leave for 20 months, and/or termination.*

(Emphasis added.)

The trial court accepted the City's proposed instruction and directed the jury to consider only whether Romulo's ultimate termination was retaliatory in the following instruction:

> To establish a claim of unlawful retaliation by the City of Seattle, Mr. Romulo has the burden of proving both of the following propositions:
> 1) That Mr. Romulo had participated in a proceeding to determine whether discrimination or retaliation had occurred; and

22

2) That a substantial factor in *the decision to terminate Mr. Romulo* was Mr. Romulo's participation in a proceeding to determine whether discrimination or retaliation had occurred.

(Emphasis added.)

C

The WLAD prohibits an employer from retaliating against any person "because he or she has opposed any practices forbidden by [the WLAD] . . . or because he or she has filed a charge . . . in any proceeding under [the WLAD]. RCW 49.60.210(1). To establish unlawful retaliation under the WLAD, "an employee must show that (1) he engaged in a statutorily protected activity, (2) the employer *took an adverse employment action against the employee*, and (3) there is a causal connection between the employee's activity and the employer's adverse action." Boyd v. State, 187 Wn. App. 1, 11-12, 349 P.3d 864 (2015) (emphasis added).

In declining to instruct the jury that it could consider actions short of termination as potential adverse employment actions, the trial court reasoned that when an employee has been terminated, other actions that led up to the termination are no longer separately actionable:

> It is the Court['s] view that the laundry list of adverse employment actions are important when you don't have an actual termination, which of course is the ultimate adverse employment action . . . .
> . . . .
> So theoretically . . . we could have had every single thing that leads to a termination. The meeting . . . where he was advised he was going to be terminated, that's an adverse action. The . . . writing of all these emails . . . from the testimony that the Court heard, these are all, you know, kind of part and parcel of the bundle of things that the city relied upon in making its determination. They are not

> separately actionable, and that is the basis for my ruling that the termination . . . is the act of retaliation.
>
> And the law with regard to adverse employment action really contemplates that many employe[rs] would take unfavorable actions against an employee but far short of termination. But here we have, frankly, the worst thing that an employer could do to an employee which is sever their relationship. So that's why I made the rulings that I did with regard to adverse employment action.

This analysis was inconsistent with Boyd. There, an employee asserted that he was subjected to a series of actions—an investigation into allegedly threatening behavior, a written reprimand, suspension without pay, and reports to public authorities—all of which he contended were in retaliation for an earlier complaint about workplace harassment. Boyd, 187 Wn. App. at 8-9, 14. But the employee was not terminated. The jury found these actions were retaliatory and returned a verdict awarding damages to the employee. Id. at 11. On appeal, we explained adverse employment actions include actions short of termination, such as "a demotion or adverse transfer, or a hostile work environment," if the action would have dissuaded a reasonable worker from making or supporting a charge of discrimination. Id. at 13 (citing Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68, 126 S. Ct. 2405, 2409, 165 L. Ed. 2d 345 (2006)). Consistent with Boyd, in Cornwell v. Microsoft Corp., the Washington Supreme Court seemed to accept that both a poor performance rating score and a subsequent termination could independently qualify as adverse actions. 192 Wn.2d 403, 412, 430 P.3d 229 (2018); cf. Little v. Windermere Relocation, Inc., 301 F.3d 958, 970 (9th Cir. 2002) (holding that both an initial reduction in guaranteed monthly base salary and a later termination could independently qualify as adverse actions).

A pattern instruction also recognizes that actions short of termination are actionable in the context of a retaliation claim. See WPI 330.05, at 339-40 (listing discipline, demotion, and denial of a promotion as examples of possible adverse employment actions). Although the pattern instruction on retaliation does not specifically reference "adverse action," the "Note on Use" to the instruction states, "When there is an issue about whether the action taken is sufficiently adverse, the definition of adverse action under WPI 330.06 . . . is to be used along with this instruction," and, "This instruction may need to be modified to instruct the jury regarding the nature of the adverse action taken and in dispute." WPI 330.05 note on use at 247. Consistent with that Note on Use, Romulo also proposed an instruction based on WPI 330.06, which is based on Boyd and directs the jury to consider whether the alleged adverse action is "harmful to the point that it would dissuade a reasonable employee from making a complaint of *[discrimination]* *[harassment]* [and] [or] *[retaliation].*" WPI 330.06, at 250. Romulo proposed instructions on retaliation through adverse action substantially in the form contemplated by the pattern instructions. Nothing in Boyd or the pattern instructions suggests, and the City does not cite any authority establishing, that when an employee has been terminated, adverse actions occurring prior to or leading up to the termination are no longer actionable.

In keeping with Boyd, and mindful that the WLAD "contains a sweeping policy statement strongly condemning many forms of discrimination" and must be "construed liberally," Allison v. Hous. Auth., 118 Wn.2d 79, 85-86, 821 P.2d 34 (1991), we hold the trial court erred when it instructed the jury that Romulo could

25

prevail on his WLAD retaliation claim only by proving his termination was retaliatory. The court's instructions were inconsistent with Boyd and misstated the law because they did not permit Romulo to prevail on proving any adverse action was retaliatory, but permitted Romulo to prevail only if he proved his termination was retaliatory. See Thoen v. CDK Constr. Servs., Inc., 13 Wn. App. 2d 174, 181, 466 P.3d 261 (2020) (instruction misstates the law when it erroneously narrows the defendant's scope of legal liability).

D

Because the court's instructions misstated the law, Romulo is entitled to a new trial if he was prejudiced. Id. at 182. Prejudice is presumed if an instruction contains a clear misstatement of law. Lake Hills Invs., LLC v. Rushforth Constr. Co., 198 Wn.2d 209, 216, 494 P.3d 410 (2021). However, prejudice must be demonstrated if the instruction is merely misleading. Id.

Here, the trial court's instruction was not merely misleading. Instead, it contained a clear misstatement of the law by directing the jury that it could find for Romulo on his retaliation claim only if it determined that Romulo's *termination* was retaliatory. Therefore, reversal is required unless the City demonstrates that the error was harmless. See Paetsch v. Spokane Dermatology Clinic, P.S., 182 Wn.2d 842, 849, 348 P.3d 389 (2015). The City fails to meet this burden.

The City contends any error was harmless because "there is insufficient evidence in the record for a reasonable juror to conclude that any cognizable adverse action . . . was motivated by retaliatory animus related to [Romulo]'s 2007 lawsuit." The City points to evidence that Roberson and Hubbert had legitimate

reasons for their treatment of Romulo and that retaliatory animus was not a substantial factor in any of their actions. But these are essentially the same arguments the City made in its CR 50 motion brought after the close of the evidence, which the trial court denied.

We conclude from the record, as did the trial court, that a reasonable juror could find a causal connection between the 2007 Lawsuit and alleged adverse employment actions carried out by Roberson and/or Hubbert. There was evidence that, while Romulo received consistently positive reviews from Pavel, he was treated differently once subject to the supervision of Hubbert and Roberson. That the alleged adverse actions occurred before any documented evidence that Hubbert re-tasked senior inspectors with HHH inspections in April 2017 further supports a causal connection. The City points out that Hubbert testified he had concerns about Romulo completing his work, that he had received feedback from customers that Romulo had been nonresponsive on two occasions, and that Hubbert and Romulo's colleagues observed that Romulo would get upset "and just kind of stay that way for a little while." But given the precipitous decline in Romulo's evaluations, a reasonable juror could conclude that these justifications were not the only reasons for the drastic change in Romulo's evaluations from Pavel to Hubbert. Cf. Allison, 118 Wn.2d at 95 (plaintiff need only show retaliation was a "substantial factor" behind the adverse employment action, not the "determining factor").

The City also points to the temporal distance between the 2007 Lawsuit and Hubbert's alleged retaliation many years later, but Hubbert testified while

27

describing the time period after his initial arrival in the USI group that he "had heard about a lawsuit." In other words, there is evidence that Hubbert learned about Romulo's lawsuit around the time he joined the USI group, which coincides with when, under the direct management of Roberson and Hubbert, Romulo began receiving new criticisms. Cf. Cornwell, 192 Wn.2d at 415-16 & n.9 (where 8 months had elapsed between manager's learning about employee's WLAD lawsuit, which had taken place years earlier, and manager's adverse actions, "it is a reasonable inference that these actions were in retaliation for [the employee's] previous lawsuit").

And, while Roberson testified he did not know about the 2007 Lawsuit—or even who Romulo was—before Romulo joined the USI group in 2009, Fair testified that Romulo's complaint was discussed at the 2008 meeting where she met with Roberson about not having obtained a required certification. A jury could reasonably infer from Fair's testimony that Roberson was not being truthful when he claimed not to know about Romulo or his lawsuit, and therefore had a reason not to be forthright. Cf. Hill v. BCTI Income Fund-I, 144 Wn.2d 172, 184, 23 P.3d 440 (2001) ("'Proof that the defendant's explanation is unworthy of credence is . . . one form of circumstantial evidence that is probative of intentional discrimination.'" (quoting Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 147, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000))), abrogated on other grounds by Mikkelsen v. Pub. Util. Dist. No. 1, 189 Wn.2d 516, 404 P.3d 464 (2017).

The City fails to show that the trial court's instructional error was harmless. And while the City advances a number of additional arguments against remand, none are persuasive.

The City contends the trial court properly rejected Romulo's proposed instructions based on their asserted untimeliness. However, the parties exchanged proposed instructions before trial, and the City acknowledged that final instructions would depend on the evidence at trial. The City's timeliness objection is not supported.

The City also faults Romulo's proposed instructions, which the City asserts "gave the jury no guidance as to what actions it was supposed to determine may have been retaliatory." But the City ignores the fact that Romulo's proposed instructions included an instruction that defined "adverse employment action" for the jury in a manner consistent with the pattern instruction and with Boyd. The City cites no authority for the proposition that Romulo was required to offer instructions providing any more guidance.

The City next contends that Romulo failed to preserve the error because he "never proposed a special verdict form that would have enabled the jury to make individual determinations as to whether retaliatory animus was a 'substantial factor' in any such actions." The record demonstrates that Romulo excepted to the trial court's failure to instruct on adverse actions short of termination; this was sufficient to allow review. See City of Bellevue v. Raum, 171 Wn. App. 124, 145, 286 P.3d 695 (2012) (appellate court may review a claimed instructional error when the party has excepted by stating distinctly the matter to which the party objects and the

29

grounds for the objection; thus, party sufficiently preserved error by properly excepting to special verdict form despite allegedly failing to offer a sufficient alternative special verdict form).

Finally, the City asserts that remand is not required because Romulo still argued in closing that actions short of termination were "part and parcel" of the termination and "that the City took innumerable actions in retaliation for his 2007 lawsuit, while simultaneously seeking a simple verdict that could provide a windfall of damages without requiring the jury to individually determine liability as to each alleged adverse action."  This does not obviate prejudice.  As instructed, the jury could not award Romulo anything unless it found that Romulo's *termination* was motivated by retaliatory animus, even if it was persuaded that *other* adverse actions were.  Given that Romulo equally asked for instructions allowing him to argue adverse actions short of termination, we are not persuaded that, as the City contends, Romulo's argument revealed a "preference" for an "all-or-nothing verdict."  See Anfinson v. FedEx Ground Package Sys., Inc., 174 Wn.2d 851, 873, 281 P.3d 289 (2012) ("[T]he fact that the instructions compelled [the plaintiff] to argue a theory of the case contrary to the one it advocated is evidence of the prejudice, not evidence of its absence.").

For the foregoing reasons, while we need not and do not disturb the jury's determination that Romulo failed to prove his theory that his *termination* violated

the WLAD, remand is required with regard to Romulo's WLAD retaliation claim to the extent it is based on employment actions *short of termination*.[5]

III

Romulo next argues that the trial court erred by declining to give his proposed instruction that would have identified, as follows, three laws as the bases for his claim for wrongful discharge in violation of public policy:

> Washington State law provides a clear expression of public policy to ensure that the public is provided safe and high quality drinking water and that the public water system is protected from contamination resulting via cross-connections.
>
> The Seattle Municipal Code provides a clear expression of public policy that it is improper for the government to engage in a gross waste of public funds or resources, which means to spend or use funds or resources, or to allow the use of any funds or resources, in a manner grossly deviating from the standard of care or competence that a reasonable person would observe in the same situation.
>
> The . . . WLAD[ ] provides a clear expression of public policy the overarching purpose of which is to deter and to eradicate discrimination in Washington. The WLAD is also a clear expression of public policy that it is an unfair practice for an employer to discriminate against any person because [ ]he has opposed practices forbidden by the WLAD.

(Emphasis omitted.)  We hold that Romulo fails to establish he was prejudiced by the absence of the instruction and, thus, reversal is not warranted on Romulo's claim for wrongful discharge in violation of public policy.

A

---

[5] In a statement of additional authority, Romulo cites Henderson v. Thompson, which set forth a framework for trial courts to apply "when a civil litigant seeks a new trial on the basis that racial bias affects the verdict."  No. 97672-4, slip op. at 19 (Wash. Oct. 20, 2022), https://www.courts.wa.gov/opinions/pdf/976724.pdf.  Romulo has at no time argued that racial bias affected the jury's verdict, and he did not seek a new trial on that basis below.  Henderson is inapplicable.

To prevail on his wrongful discharge claim, Romulo had to establish that his termination violated a "clear mandate of public policy." Thompson v. St. Regis Paper Co., 102 Wn.2d 219, 232, 685 P.2d 1081 (1984).

To this end, the first public policy Romulo's proposed instruction would have identified is "a clear expression of public policy to ensure that the public is provided safe and high quality drinking water and that the public water system is protected from contamination resulting via cross-connections." But the jury was given a preliminary instruction, which the court repeated in its final instructions, that Romulo was alleging the City "wrongfully discharged his employment *in violation of public policies concerning the safety of the public water system.*" (Emphasis added.) Also, while Romulo disagreed with the SPU's *approach* to advancing this public policy, there was no dispute as to the policy's existence. Witnesses at trial testified that cross-connections implicate public safety concerns and that the very purpose of the cross-connection control program is to protect public health. And, the exhibits submitted to the jury included copies of the DOH's rules related to cross-connection control, which provide that "[t]he purpose of the . . . cross-connection control program shall be to protect the public water system," and the SPU's rules for its cross-connection program, which state they are intended to "protect the health of water consumers and the potability of the public water system." On the record before us, we are not persuaded that Romulo was prejudiced by the absence of an additional instruction on a water-quality-related public policy. The jury was appropriately informed through the court's instructions

and the parties' related evidence of the existence and nature of the public policy on which Romulo relied.

B

The second public policy that Romulo's proposed instruction would have identified was a "public policy that it is improper for the government to engage in a gross waste of public funds or resources." Romulo asserted the sources for this public policy were provisions of Seattle's and the state's whistleblower protection statutes, which provide that "improper governmental action" includes government action that results in a gross waste of public funds. RCW 42.41.020(1)(a)(ii); SMC 4.20.805. Romulo's theory was that his being on paid administrative leave since October 2017 until his termination in 2019 was a gross waste of public funds.

But the statutes on which Romulo relies expressly exclude "personnel actions" from the definition of "improper governmental action." RCW 42.41.020(1)(b); SMC 4.20.805. Because Romulo's being placed on paid administrative leave was a personnel action, Romulo cannot establish he was prejudiced by the trial court's decision not to instruct the jury as to the existence of a public policy against a gross waste of public funds.

C

The third and final public policy that Romulo's proposed instruction would have identified was "a clear expression of public policy the overarching purpose of which is to deter and to eradicate discrimination in Washington" and "that it is an unfair practice for an employer to discriminate against any person because she has opposed practices forbidden by the WLAD." But the jury was expressly

instructed, in connection with Romulo's WLAD retaliation claim, that "[i]t is unlawful for an employer to retaliate against a person for participating in a proceeding to determine whether discrimination or retaliation occurred." It was also instructed that its verdict should be for Romulo if Romulo established that his termination was in retaliation for his WLAD-protected conduct. The jury found against Romulo on this claim, and Romulo does not explain how a jury that rejected his WLAD retaliation claim could have come to a different determination as to a claim that Romulo was terminated, in violation of public policy, for opposing practices forbidden by the WLAD. Cf. Boeke v. Int'l Paint Co. (Cal.), Inc., 27 Wn. App. 611, 615, 620 P.2d 103 (1980) (trial court's failure to instruct on a theory was not prejudicial where the jury's verdict clearly indicated that the evidence did not establish a necessary element of the theory).

The trial court's decision not to give Romulo's additional proposed instruction on public policies does not require reversal.

IV

Romulo contends the trial court erred by granting the City summary judgment on his racially hostile work environment claim.[6] We disagree.

A

We review summary judgment orders de novo. Keck v. Collins, 184 Wn.2d 358, 370, 357 P.3d 1080 (2015). "[S]ummary judgment is appropriate where there is 'no genuine issue as to any material fact . . . and the moving party is entitled to

---

[6] Romulo does not assign error to the trial court's summary judgment dismissal of his claim for "harassment . . . in retaliation for complaining about discrimination and retaliation, and for filing a whistleblower complaint."

a judgment as a matter of law.' " Elcon Constr., Inc. v. E. Wash. Univ., 174 Wn.2d 157, 164, 273 P.3d 965 (2012) (second alteration in original) (quoting CR 56(c)). Although evidence is viewed in the light most favorable to the nonmoving party, if that party bears the burden of proof on the issue and fails to make a factual showing sufficient to establish an element essential to the party's case, summary judgment is warranted. Young v. Key Pharms., Inc., 112 Wn.2d 216, 225, 770 P.2d 182 (1989).

B

To demonstrate a hostile work environment, Romulo must establish he suffered harassment that (1) was unwelcome, (2) affected the terms and conditions of employment, (3) was because Romulo was a member of a protected class, i.e., Filipino, and (4) is imputable to the City. Loeffelholz v. Univ. of Wash., 175 Wn.2d 264, 275, 285 P.3d 854 (2012).

On appeal, Romulo "focuses his racially hostile work environment claim on Hubbert's adverse acts." Romulo contends there were genuine issues of material fact as to whether any of Hubbert's conduct created a racially hostile work environment. The dispositive question is whether Romulo would have been subjected to Hubbert's alleged harassment if he had not been Filipino. See Adams v. Able Bldg. Supply, 114 Wn. App. 291, 298, 57 P.3d 280 (2002). Romulo points to no evidence that Hubbert ever mentioned Romulo's ethnicity, much less that Romulo's ethnicity was *the motivating factor* for Hubbert's alleged harassment. Doe v. Dep't of Transp., 85 Wn. App. 143, 150, 931 P.2d 196 (1997) ("The burden is on the plaintiff to produce competent evidence that supports a reasonable

inference that his [membership in a protected class] was the motivating factor for the harassing conduct."). Instead, he suggests that an inference of discriminatory intent based on his membership in a protected class can be made from the harassment itself and the fact that Hubbert's treatment of him "stands in stark contrast with Pavel's treatment of him."

But Romulo cites no authority supporting the proposition that the fact of harassment alone is sufficient to raise a genuine issue of material fact as to whether the harassment was "because" Romulo was a member of a protected class. Romulo asserts that "Hubbert evinced a lack of respect for how Romulo communicated in English" by "unnecessarily calling attention to the way he confused 'maybe' with 'may be'" in the February 2017 e-mail exchange where Romulo requested to use a personal holiday due to inclement weather. But Romulo points to no evidence that Hubbert's attempt to address what Romulo himself admits was confusion about Hubbert's e-mail constituted racially motivated conduct. Romulo also asserts that Hubbert "arbitrarily" limited Romulo's participation in FACES. But the record does not support this assertion. Although Hubbert denied Romulo's request to take a day of vacation to attend the full-day FACES conference, Romulo points to no evidence to support a reasonable inference that, had Romulo not been Filipino or had he requested vacation to attend a non-affinity-group event, Hubbert would have granted his request. The trial court did not err in concluding that Romulo failed to raise a genuine issue of material fact as to the existence of a racially hostile work environment.

Romulo cites Rice v. Offshore Systems, Inc., 167 Wn. App. 77, 272 P.3d 865 (2012), and Specialty Asphalt & Construction, LLC v. Lincoln County, 191 Wn.2d 182, 421 P.3d 925 (2018), for the proposition that he need not show that Hubbert said something about his race or national origin to survive summary judgment. We agree, in general, that proof of discriminatory animus often depends on inference. But neither Rice nor Specialty Asphalt was a hostile work environment case; both were disparate treatment cases, in which the claimants were treated differently from other persons not sharing their membership in protected classes, and in any event both cases included comments minimally supporting an inference of discrimination. See Rice, 167 Wn. App. at 81, 88 (comments about age); Specialty Asphalt, 191 Wn.2d at 192 & n.6, 193-94 (comments about women's attire, coupled with other conduct suggesting disparate treatment). In contrast, Romulo presents no evidence of discrimination based on his membership in a protected class. Summary judgment was proper.

V

Romulo next contends the trial court erred by (1) denying his motion for partial summary judgment dismissal of the City's failure to state a claim defense to Romulo's SMC-based whistleblower retaliation claim and (2) summarily dismissing that claim. We disagree.

A

The SMC contains a whistleblower protection code, SMC 4.20.800 et seq., whose purposes include "[e]ncourag[ing] City employees to report in good faith assertions of improper governmental action[,] provid[ing] employees with a clear

process for making reports," and "[p]rovid[ing] City employees protection from retaliatory action for making a good faith report or being perceived as making a report." SMC 4.20.800(A)-(B).

To seek relief for alleged whistleblower retaliation under the SMC, an employee must file a signed written complaint with the executive director of the SEEC. SMC 4.20.860(A)(1)-(2); see also RCW 4.20.805 (defining "Executive Director"). The executive director makes an initial determination as to the sufficiency of the complaint, and "[i]f the Executive Director finds the complaint to be insufficient, he or she shall dismiss the complaint and give notice to the employee." SMC 4.20.860(B)(1)-(2). An employee may pursue a private cause of action under the SMC, but only "after filing a timely and sufficient complaint with the Executive Director" and only if certain additional conditions are satisfied. SMC 4.20.870(A)(2).

In August 2019, Romulo filed an SMC whistleblower retaliation complaint with the executive director. In September 2019, the executive director notified Romulo that his complaint was "insufficient" because it did not "allege facts that establish a reasonable appearance that any of the reports [Romulo] made contributed to any adverse change to [his] employment." The executive director dismissed Romulo's complaint.

In February 2020, Romulo filed a "Motion for Declaration of Right to Sue Under Local Government Whistleblower Law." Romulo sought an order from the trial court "affirming" that he had a right to pursue a private cause of action under the SMC notwithstanding the executive director's determination that Romulo's

SMC complaint was insufficient. The trial court treated Romulo's motion as a motion for partial summary judgment to dismiss the City's affirmative defense of failure to state a claim as to Romulo's claim for whistleblower retaliation in violation of the SMC, and it denied the motion. The City later moved for summary judgment on Romulo's SMC-based retaliation claim, and the trial court granted that motion based on its earlier ruling.

B

Romulo's challenge to the trial court's decisions requires us to interpret the SMC. Thus, review is de novo. Drummond v. Bonaventure of Lacey, LLC, 20 Wn. App. 2d 455, 460, 500 P.3d 198 (2021). " 'The primary objective of any statutory construction inquiry is to ascertain and carry out [legislative] intent.' " Id. (internal quotation marks omitted) (quoting HomeStreet, Inc. v. Dep't of Revenue, 166 Wn.2d 444, 451, 210 P.3d 297 (2009)). "When we interpret a statute, we first consider the plain language of the statute." Id. "If a statute's plain language can only have one interpretation, then the inquiry ends." Id.

The SMC prohibits any City agency, officer, or employee from retaliating against any "cooperating employee," including an employee who "[i]n good faith makes a report of alleged improper governmental action." SMC 4.20.805, .810(C). An employee alleging retaliation in violation of the SMC must file a complaint with the executive director, who must then make an initial determination whether the complaint is sufficient. SMC 4.20.860(A)-(B). "The Executive Director shall find the complaint sufficient if the complaint asserts facts that, if true, would show: [1] the employee is a cooperating employee; [2] the employee was subjected to an

adverse change or changes that occurred within the prescribed time period; and [3] the employee's protected conduct reasonably appears to have been a contributing factor." SMC 4.20.860(B)(3). The SMC allows a cooperating employee to pursue a private cause of action under limited circumstances. But, the circumstances allowing a private cause of action cannot ever come about where the executive director dismisses a complaint as insufficient. See SMC 4.20.870(A)-(B).

Here, the executive director determined that Romulo's complaint was insufficient and dismissed it. Thus, the prerequisites to a private cause of action were not satisfied, and under the plain language of the SMC, Romulo did not state a claim for which relief could be granted. The trial court did not err by (1) denying Romulo's motion for partial summary judgment dismissing the City's failure to state a claim defense to Romulo's SMC-based retaliation claim or (2) summarily dismissing that claim.

Romulo argues that under the SMC, "[a]ccess to *any* remedy is contingent on the [executive director]'s sufficiency determination." Thus, he contends, if the executive director erroneously or arbitrarily dismisses an employee's complaint as insufficient, that employee is left without a remedy, and "[t]his leaves the system open to abuse." Romulo's concerns are not without merit: Nothing in the SMC suggests that the executive director's sufficiency determination is reviewable. But Romulo did not plead any claim for relief from or review of the executive director's determination, much less prove that it was erroneous or arbitrary, and it does not

follow from the mere fact that the SMC may be open to abuse that any abuse occurred in Romulo's case or that the claim Romulo *pleaded* is viable.

Romulo next asserts that the Executive's Director "gatekeeping function" is "unlawful" because state law, specifically the local government whistleblower protection act, chapter 42.41 RCW (LGWPA), "guarantees victims of whistleblower retaliation by local governments a right to be heard by a neutral decisionmaker." The LGWPA makes it "unlawful for any local government official or employee to take retaliatory action against a local government employee because the employee provided information in good faith . . . that an improper governmental action occurred." RCW 42.41.040(1). To seek relief under the LGWPA, "a local government employee shall provide a written notice of the charge of retaliatory action to the governing body of the local government." RCW 42.41.040(2). Upon receiving a response, the local government employee may request an administrative hearing subject to subsequent judicial review. RCW 42.41.040(4)-(5), (9).

The LGWPA provides that "[a]ny local government that has adopted or adopts a program for reporting alleged improper governmental actions and adjudicating retaliation resulting from such reporting shall be exempt from [the LGWPA] *if the program meets the intent of this chapter.*" RCW 42.41.050 (emphasis added). Romulo contends that the SMC's whistleblower protection provisions fail to meet the intent of the LGWPA inasmuch as they impose a hurdle to agency adjudication that is absent from the LGWPA. But we need not and do not express any opinion on whether the executive director's gatekeeping function

41

renders the SMC incompatible with the intent of the LGWPA because, even if it does, it still does not follow that Romulo may maintain a lawsuit against the City for whistleblower retaliation. The LGWPA itself provides only for *administrative relief* from whistleblower retaliation, not a private cause of action in superior court. See Woodbury v. City of Seattle, 172 Wn. App. 747, 752, 292 P.3d 134 (2013).

Romulo did not state a claim for civil relief under the terms of the SMC and so his claim was properly dismissed. We do not reach the question of whether the SMC's provision for dismissal by the executive director without an apparent path to further review gives rise to any viable claims. Romulo did not assert a claim seeking relief from either the SMC's alleged failure to provide an adequate administrative remedy or alleged improper action by the executive director. Rather, Romulo sought simply to assert a claim for damages based on whistleblower retaliation. But that claim is not authorized under the SMC after a determination of insufficiency by the executive director, and is not authorized by any other applicable law to which Romulo points. We affirm the trial court's dismissal of Romulo's claim under the SMC.

VI

At trial, the court ruled in limine that anything that would be shown to the jury, including counsels' opening and closing slide decks, needed to be shown to opposing counsel and reviewed by the court in advance. Romulo contends the trial court erred by requiring his counsel to disclose his slide decks because they constituted work product.

CR 26(b)(4) protects work product *from discovery*, but Romulo offers no authority for the proposition that a trial court cannot, *once trial has begun* and as part of the court's discretion to manage the courtroom and trial, require the exchange of materials that each party intends to show the jury. See Pierce v. Bill & Melinda Gates Found., 15 Wn. App. 2d 419, 444, 475 P.3d 1011 (2020) (court has "wide discretion" to manage trial). Romulo also does not articulate how disclosure of his counsel's slide decks shortly before opening and closing prejudiced him. In the absence of any prejudice that Romulo can point to, we do not second guess the trial court's management of opening and closing.

VII

We remand for further proceedings consistent with this opinion on Romulo's WLAD retaliation claim solely to the extent it is based on alleged adverse employment actions short of termination. We affirm in all other respects.

Birk, J.

WE CONCUR:

Brenman, J.        Andrus, C.J.